908 F.2d 561
 UNITED STATES of America, Plaintiff-Appellee and Cross-Appellant,
v.
Mark Carden McNUTT, Defendant-Appellant and Cross-Appellee.
 Nos. 89-5153, 89-5167.
 United States Court of Appeals,
Tenth Circuit.
 July 3, 1990.
 
 Kenneth P. Snoke, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with him on the brief), Tulsa, Okl., for plaintiff-appellee and cross-appellant.
 Anthony M. Laizure of Stipe, Gossett, Stipe, Harper, Estes, McCune & Parks, Tulsa, Okl., for defendant-appellant and cross-appellee.
 Before LOGAN and BALDOCK, Circuit Judges, and DUMBAULD, District Judge.*
 BALDOCK, Circuit Judge.
 
 
 1
 Defendant-appellant Mark Carden McNutt was convicted by a jury of conspiracy to 1) traffic in a counterfeit access device, 18 U.S.C. Sec. 1029, and 2) manufacture, possess, assemble or sell a surreptitious interception device, 18 U.S.C. Sec. 2512(1)(b). On appeal, McNutt argues that neither Sec. 1029 nor Sec. 2512 apply to the cloned satellite television descramblers which led to his indictment. We hold that Sec. 1029 cannot be applied to satellite television descramblers, but Sec. 2512 can be. Because the jury placed independent reliance upon Sec. 1029 and Sec. 2512 as substantive offenses underlying the conspiracy, we affirm his conspiracy conviction. However, since the district court may have relied upon Sec. 1029 in calculating McNutt's sentence, we remand for resentencing.
 
 I.
 
 2
 National programmers of pay television transmit their programming to communications satellites. These satellites then relay the television signals to large receiver dishes, usually operated by a local cable television operator. Cable companies pay a royalty to the national programmer and provide television service via wire to home television viewers in exchange for a monthly service charge.
 
 
 3
 The 1980s saw a profusion of home satellite dishes capable of receiving signals directly from these communications satellites, bypassing local cable companies altogether. Owners of home satellite dishes could obtain the benefits of national pay television programming without paying for the service. As the use of home satellite dishes proliferated, programmers sought to protect their investment by scrambling their broadcasts, rendering such broadcasts unintelligible to unauthorized viewers. DiGeronimo, Protecting Wireless Communications: A Detailed Look at Section 605 of the Communications Act, 38 Fed.Comm.L.J. 411, 430-31 n. 101 (1987). In order to descramble broadcast signals, owners of satellite television dishes must purchase a descrambler module, each with its own unique electronic "address." Television Engineering Handbook 9.34 (K. Benson ed. 1986). Home viewers then contact the programming service, identify the electronic address on their descrambler module and provide necessary billing information. Once an account is opened, the national pay television service programs the subscriber's electronic address into its satellite transmissions. These transmissions then trigger the particular descrambler module to descramble the television signal.
 
 
 4
 McNutt was convicted of conspiracy to possess, manufacture, assemble or sell descrambler modules with "cloned" electronic addresses taken from descramblers with legitimate programming accounts. (Two legitimately sold descrambler modules never have the same address.) By using a cloned descrambler, the electronic message from a national pay television service intended to trigger a single descrambler actually triggered several, even though pay television service had only been arranged for one electronic address. So long as that single legitimate account was maintained, owners of cloned descramblers could view scrambled programming without paying any subscription fees.
 
 II.
 
 5
 The first basis of the jury's conspiracy finding was 18 U.S.C. Sec. 1029 which prohibits the trafficking, possession, use and manufacture of "counterfeit access devices."[1] Under Sec. 1029,
 
 
 6
 the term 'access device' means any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value....
 
 
 7
 18 U.S.C. Sec. 1029(e)(1) (emphasis supplied). The government contends that cloned electronic addresses on satellite television descrambler modules are an unauthorized "means of account access" under Sec. 1029. Because the plain wording of the statute does not reveal whether the address on a satellite television descrambler is cognizable under Sec. 1029, we consult the legislative history behind Sec. 1029 as a "secondary source" to help us determine the scope of the statute. See Miller v. Commissioner, 836 F.2d 1274, 1282-83 (10th Cir.1988) (reliance on legislative history is appropriate where statute is unclear and legislative history is consulted with specific question in mind).
 
 
 8
 In enacting Sec. 1029, "Congress was focused upon the fraudulent use of [access] devices in connection with credit transactions...." United States v. Blackmon, 839 F.2d 900, 913-14 (2d Cir.1988) Congress sought to address "the growing problem in counterfeit credit cards and unauthorized use of account numbers or access codes to banking system accounts...." H.R. Rep. 894, 98th Cong., 2d Sess., reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3689. Congress sought to include in its definition of access devices "credit cards, debit cards, account numbers and combinations of these and other methods of obtaining goods and services." Id. at 3705. Section 1029 has been applied to the unauthorized use of credit cards, see United States v. Ryan, 894 F.2d 355, 357 (10th Cir.1990), and long distance telephone access codes, see United States v. Teehee, 893 F.2d 271, 272 (10th Cir.1990). However, the government does not cite, nor have we been able to locate, a single case in which Sec. 1029 has been applied to electronic addresses of satellite television descramblers.
 
 
 9
 The government contends that the electronic addresses in descramblers are a "means of account access" under Sec. 1029(e)(1) because legitimate viewers who pay subscription fees to satellite television programmers provide a "free ride" to the users of cloned descramblers. In advancing this argument, however, the government has mistaken economic losses for actual monetary losses resulting from discrete transactions reflected in the company's accounting records. See R. Posner, Economic Analysis of Law Sec. 1.1 at 6-7. As used in Sec. 1029, an account constitutes "a formal record of debits and credits." See Random House Dictionary of the English Language 13 (2d ed.1987). Unlike the unauthorized use of credit cards or long distance telephone access codes, use of cloned descrambler modules does not debit legitimate subscribers' accounts; no additional charges are accrued as a result of the unauthorized use. Unquestionably, operators of satellite television services suffer economic losses from the revenue forgone due to the use of cloned descrambler modules; viewers who otherwise would subscribe to a legitimate pay television service elect to obtain the same service through a cloned descrambler. Moreover, "free riding" by users of cloned descramblers increases the overall cost of satellite television services to legitimate viewers. Although Congress unquestionably has the power to protect broadcasters and viewers of satellite television from these economic harms,[2] we find nothing in the plain wording, legislative history or judicial interpretation of Sec. 1029 which would lead us to believe that Congress intended that statute to apply to anything other than direct accounting losses. See, e.g., Blackmon, 839 F.2d at 913-14 (conviction under Sec. 1029(a)(3) for use of unauthorized credit cards for false identification purposes was improper).
 
 III.
 
 10
 The second prong of McNutt's conspiracy conviction was 18 U.S.C. Sec. 2512. Section 2512 imposes criminal sanctions against one who intentionally:
 
 
 11
 manufactures, assembles, possesses or sells any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications ....
 
 
 12
 18 U.S.C. Sec. 2512 (emphasis supplied). Under Sec. 2512, " 'intercept[ion]' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. Sec. 2510(4). Under the statute,
 
 
 13
 'electronic communication' means any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce....
 
 
 14
 18 U.S.C. Sec. 2510(12) (emphasis supplied).
 
 
 15
 McNutt argues that the legislative history behind Sec. 2512 clearly establishes that satellite television broadcasts are not encompassed under the statute as electronic communications. However, we find the legislative history ambiguous on this question. Admittedly, the Senate Report indicates at one point that electronic communications "cannot fairly be characterized as containing the human voice." S.Rep.No. 99-541, 99th Cong.2d Sess., reprinted in 1986 U.S.Code Cong & Admin.News 3555, 3568. However, two sentences later, the report lists electronic communications as including video teleconferences which clearly contain the human voice. Id. The report also contains repeated references to satellite television broadcasts and the problems associated with their unauthorized interception. See id. at 3560, 3561, 3573. In contrast to this ambiguity, the plain wording of Sec. 2510(12) encompasses satellite television signals. It is undisputed that satellite television transmissions contain sounds and images and are carried via radio waves; therefore they constitute electronic communications under Sec. 2510(12). Satellite television descramblers also are electronic devices which effectuate the interception of electronic communications. Because the providers of pay television programming are unaware that their signals are being intercepted by cloned descramblers, such interception is surreptitious. Although some legislative history to the contrary exists, the clarity of the statutory language contrasted with the ambiguity in the legislative history obliges us to follow the plain wording of the statute. See Miller, 836 F.2d at 1282-83. We are "hesitant to give the words of the statute an altogether different meaning ... because the direct legislative history is scant and capable of differing interpretations," id. at 1282, and consequently hold that McNutt properly was charged under Sec. 2512.
 
 IV.
 
 16
 "[A] person is guilty of conspiracy if he agrees with one or more other persons to violate the law, and then any one of the conspirators commits an overt act in furtherance of the object of the agreement." United States v. Gonzalez, 797 F.2d 915, 916 (10th Cir.1986). However, where the underlying offense agreed upon by the putative conspirators does not constitute a substantive violation of federal law no conspiracy can be effectuated under 18 U.S.C. Sec. 371. Lubin v. United States, 313 F.2d 419, 422 (9th Cir.1963). Here, the jury indicated by special verdict that it relied both on Sec. 1029 and Sec. 2512 in finding McNutt guilty of conspiracy. Because an intent to violate Sec. 2512 standing alone can support a finding of conspiracy, we can say with assurance that the jury's improper reliance upon 18 U.S.C. Sec. 1029 did not have a substantial influence upon its finding that McNutt was guilty of conspiracy to violate Sec. 2512. See Fed.R.Crim.P. 52(b); United States v. Rivera, 900 F.2d 1462, 1469-70 (10th Cir.1990) (en banc). McNutt's conviction under 18 U.S.C. Sec. 371 therefore must stand.
 
 V.
 
 17
 In calculating the appropriate sentence for a conspiracy conviction, the base offense level is that of the substantive offense which formed the object of the conspiracy. See United States Sentencing Commission, Guidelines Manual, Sec. 2X1.1(a) (Nov.1989). Here, McNutt's presentence report reveals that the probation office relied upon 18 U.S.C. Sec. 1029 as the object offense and tabulated his offense level based upon Sec. 2F1.1 of the Guidelines. Because we hold that McNutt did not violate Sec. 1029, utilization of that statute in calculating McNutt's sentence was improper. Even though the district court departed downward from the recommended sentence, we cannot say that the court was not influenced by the offense level calculated by the presentence report. McNutt therefore must be sentenced under Guidelines Sec. 2H3.2 with 18 U.S.C. Sec. 2512 as the object offense.
 
 
 18
 McNutt's conviction is AFFIRMED and REMANDED for resentencing consistent with this opinion.[3]
 
 
 
 *
 The Honorable Edward Dumbauld, Senior United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The statute provides in pertinent part:
 Sec. 1029 Fraud and related activity in connection with access devices
 (a) Whoever--
 (1) knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices;
 (2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $ 1,000 or more during that period;
 (3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices; or
 (4) knowingly, and with intent to defraud, produces, traffics in, has control or custody of, or possesses device-making equipment;
 shall, if the offense affects interstate or foreign commerce, be punished as provided in ... this section.
 
 
 [2]
 Congress provided such protection in 47 U.S.C. Sec. 605(e)(4) which provides in pertinent part:
 Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming ... shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both....
 McNutt therefore could be subject to civil and criminal penalties under Sec. 605. See ON/TV of Chicago v. Julien, 763 F.2d 839, 842-43 (7th Cir.1985) (sale of "decoder kits" for subscription television violates Sec. 605); National Subscription Television v. S & H TV, 644 F.2d 820, 825 (9th Cir.1981) (same); Chartwell Communications v. Westbrook, 637 F.2d 459, 466 (6th Cir.1980) (same); Subscription Television of Washington v. Kaufmann, 606 F.Supp. 1540, 1544-55 (D.D.C.1985) (same); United States v. Westbrook, 502 F.Supp. 588, 592 (E.D.Mich.1980) (unauthorized sale of television descramblers constitutes criminal violation of Sec. 605).
 
 
 [3]
 Because we remand for resentencing, we need not address the government's cross-appeal challenging McNutt's sentence