**UNITED STATES of America,**

v.

**John K. BRADY.**

No. 92–CR–265J.

United States District Court,
D. Utah, C.D.

April 7, 1993.

---

Stanley H. Olson, Asst. U.S. Atty., U.S. Attorney's Office, Salt Lake City, UT, for plaintiff.

Rodney G. Snow, Anneli R. Smith, Clyde, Pratt & Snow, Salt Lake City, UT, for defendant.

## MEMORANDUM OPINION

JENKINS, Chief Judge.

On October 24, 1992, John K. Brady was indicted on four counts of violation of 18 U.S.C. § 1029(a)(1). Counts I through III allege that on or about "between January 1, 1991 and February 28, 1991," "April, 1991" and "December 1991," respectively:

> within the Central Division of the District of Utah, John K. Brady knowingly, and with intent to defraud, trafficked in a counterfeit access device, as defined in 18 U.S.C. § 1029(e)(2); that is, an altered cellular telephone, permitting unauthorized access to telephone services, such conduct having an effect on interstate commerce, all in violation of 18 U.S.C. § 1029(a)(1).

Count IV alleges that "between January, 1991 and December 31, 1991, within the Central Division of the District of Utah,"

> John K. Brady knowingly, and with intent to defraud, used a counterfeit access device, as defined in 18 U.S.C. § 1029(e)(2); that is, an altered cellular telephone, permitting unauthorized access to telephone services, such conduct having an effect on interstate commerce, all in violation of 18 U.S.C. § 1029(a)(1).

Defendant Brady has moved to dismiss the indictment on several grounds: (1) that the indictment is legally insufficient for failure to allege an essential element of the offense, viz., that access was gained to one or more accounts; (2) that the Government has breached an agreement not to prosecute this defendant;[1] and (3) that the Government has since admitted that it is unable to prove the elements of an offense under section. 1029(a)(1).

Cellular telephone service is based upon a system of individual cellular telephone units having wireless radio transmission capabilities and which operate within a series of geographic "cells," each of which is served by a radio transmitter capable of handling as many as 666 channels. As the user moves

---

1. In the alternative, defendant has moved to suppress a statement given by him to the Secret Service on the grounds that it was not voluntary and was obtained in violation of his constitutional rights. *See* Defendant's Motion to Dismiss the Indictment, or, in the Alternative, to Suppress His Statement, dated December 15, 1992.

from one cell to another, transmission of telephone calls is automatically shifted from one transmitter to the other, thus maintaining a consistent signal quality. *See generally MCI Cellular Tel. Co. v. Federal Communications Comm'n,* 738 F.2d 1322, 1324 (D.C.Cir.1984); Transcript of Hearing, 2/25/93, at 112:21–113:4 (Testimony of DeRay Sudweeks).

As explained by the Government and defense witnesses, cellular telephone units typically are programmed to contain two identifying code numbers, commonly referred to as the ESN [2] and the MIN.[3] For identification purposes, both numbers are transmitted to the cellular system by the cellular telephone unit at the time that a call is initiated.

Through proffer and presentation of testimony at the hearing on defendant's motion,[4] the Government now avers that each of the four Mitsubishi Series 800 cellular phones at issue herein have been "altered" and thereby rendered "counterfeit" through either the replacement or reprogramming of the microchip containing the unit's Electronic Serial Number (ESN).[5] According to the Government's witnesses, cellular telephones altered in this fashion may be used to circumvent the

normal billing process for use of the cellular system in two ways: "cloning" [6] and "free riding." [7] *See generally,* Carla Lazzareschi, *Bootleg Cellular Phones are Dialing Up a Fortune,* LOS ANGELES TIMES, December 4, 1992, at A1.

Based upon the testimony and argument offered at the hearing, there appears to be little doubt that a "cloned" cellular phone— one with an ESN and MIN identical to another existing but legitimate unit—would represent an "access device" clearly falling within the ambit of section 1029(a)(1). However, the Government has conceded that cloning of cellular telephones is not at issue under the existing indictment. *See* Transcript of Hearing, 3/1/93, at 236:4–237:21.

 Instead, the question now presented in this case is whether a cellular telephone used for the purposes of "free riding" on the telephone system or transferred to another for that purpose, constitutes an "access device" within the meaning of section 1029. The Government argues that the cellular telephones at issue gained access to accounts of Cellular One and U.S. West (the two cellular phone carriers licensed to provide such

2. **ESN**—Electronic Serial Number—a unique numerical code embedded in each cellular telephone by the manufacturer identifying that particular instrument. (Transcript of Hearing, 2/25/93, at 103:14–20 (Testimony of DeRay Sudweeks)) The first two digits of the eight-digit ESN code identifies the manufacturer, e.g., an "86" prefix indicates a cellular telephone manufactured by Mitsubishi. (Transcript of Hearing, 2/26/93, at 126:14–19 (Testimony of Fritz D. Aschauer).)

3. **MIN**—Mobile Identification Number—a ten-digit numerical telephone number (area code + seven-digit telephone number) assigned to each cellular telephone customer, usually identical to the customer's home telephone number. (Transcript of Hearing, 2/25/93, at 103:8–13, 21–23, 104:9–12 (Testimony of DeRay Sudweeks).)

4. The text of the indictment itself offers little assistance as how the cellular phones in question were altered so as to render them "counterfeit;" it simply alleges that defendant Brady either transferred or used a "counterfeit access device," "that is, an altered cellular telephone, permitting unauthorized access to telephone services...."

5. Counsel for the Government represented that none of the ESNs currently programmed into the four units contain the "86" prefix that is characteristic of cellular telephones manufactured by Mitsubishi, thereby justifying an inference of alteration. (*See* Transcript of Hearing, 3/1/93, at 231:8–18.)

6. **Cloning**—Programming a cellular telephone to have an ESN and an MIN identical to that of another cellular telephone having a valid ESN/MIN combination assigned to a customer, thereby enabling the user to obtain telephone services through having access to that customer's account. (Transcript of Hearing, 2/25/93, at 109:17–110:12 (Testimony of DeRay Sudweeks).)

7. **Free-riding**—Use of a cellular telephone which has been programmed to avoid or defeat access or billing to an individual customer account, e.g., by "tumbling" the ESN and/or MIN.
**Tumbling**—changing either the ESN or the MIN (or both) programmed into a particular cellular telephone instrument, often using numbers chosen at random. (Transcript of Hearing, 2/25/93, at 104:16–17, 105:23–25, 107:13–15 (Testimony of DeRay Sudweeks).)

services in this geographical service area [8]), but concedes that it cannot show that these units gained access to identifiable valid customer or subscriber accounts at either U.S. West or Cellular One. (*See* Transcript of Hearing, 3/1/93, at 236:17–24, 237:12–21.)

### The Statute

The indictment alleges that defendant Brady has violated section 1029(a)(1), which reads as follows:

(a) Whoever—

(1) knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices; . . .

shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c). . . .

The key terms of section 1029(a)(1) are given further definition by section 1029(e)(1) and (2):

(e) As used in this section—

(1) the term "access device" means any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);

(2) the term "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device of a counterfeit access device; . . . .

The statute itself is silent on the subject of cellular telephones, telephone account numbers, or access codes. Some limited guidance as to meaning may be found in the legislative history of section 1029.

Section 1029 was added to Title 18 of the United States Code as part of the "Counterfeit Access Device and Computer Fraud and Abuse Act of 1984," which was incorporated into the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, § 1602(a), 98 Stat. 2183–84. As capsulized by the *Department of Justice Manual*, the legislative history reflects that "Congress intended that prosecutions for the use of 'unauthorized access devices' be directed to activity involving a criminal or an organized crime ring that traffics in fraudulent credit cards." 9 United States Department of Justice Manual § 9–49.130 (Supp.1989).[9] *Accord, United States v. Ryan*, 894 F.2d 355, 357 (10th Cir. 1990); *United States v. Gugino*, 860 F.2d 546, 549 (2d Cir.1988).

Much of the pertinent language of section 1029 appears to be derived from identical language in H.R. 5616, as passed by the House on July 24, 1984. The House Committee Report on H.R. 5616 addresses the intended scope of the term "access device:"

This would cover credit cards, debit cards, account numbers, and combinations of these and other methods of obtaining money, goods and services. The definition of this term is broad enough to encompass future technological changes and the only limitation i.e., "(other than a transfer originated solely by paper instrument)" excludes such activities as passing forged checks. This definition, however, includes the invoices, vouchers, sales drafts, and other manifestations of access devices used between merchants and credit card companies for payment for access device transactions. Thus, any such paper medium would itself be an "access device" quite apart from any card, plate or similar device that may have been used in creating such a paper instrument.

H.R.Rep. No. 894, 98th Cong., 2d Sess. 19 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3705. The statutory phrase "along or in conjunction with another

---

**8.** *See generally,* 47 C.F.R. § 22.900–22.930 (1992); *MCI Cellular Tel. Co.*, 738 F.2d at 1324–25.

**9.** *See also* H.R.Conf.Rep. 1159, 98th Cong., 2d Sess. 418 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin News 3182, 3714 (A Senate amendment in the conference committee (Amendment No. 159) added language which "[p]rohibits use, production and trafficking in 'counterfeit' credit cards and credit card production equipment with intent to defraud. It prohibits use or trafficking in 'unauthorized' credit cards which are valid cards which have been lost or stolen.")

access device," according to the House Committee,

> is intended to cover any account access elements or means of identification currently available or that may become technologically available, which may be used in connection with accounts but which themselves may not be "access devices." An example of this would be personal identification number (PIN) which may be used in connection with card access devices.

*Id.*

The House Committee Report ascribes a broad sweep to the definition of "counterfeit access device" now set forth in section 1029(e)(2):

> The definition is intended to be sufficiently broad to cover components of an access device or a counterfeit access device, but would exclude indistinguishable raw materials. The components would include elements of devices that are legitimate but obtained or used with an intent to defraud. Thus any identifiable component, whether it is in fact an actual component that has been obtained in some fashion by a perpetrator with intent to defraud or a false or counterfeit substitute for a legitimate component would fall within the definition of counterfeit access device. The Committee intends the term "component" to include incomplete access devices or counterfeit access devices, such as any mag strips, holograms, signature panels, microchips, and blank cards of so-called "white plastic."

*Id.*

■ The House Committee's reference to microchips as "components" of counterfeit access devices appears to arise in the context of credit cards as access devices.[10] Nevertheless, to the extent that the semiconductor chip containing the ESN in a cellular telephone has been replaced, or in some fashion reprogrammed, this court is satisfied that chip has been rendered "a false or counterfeit substitute for a legitimate component"

within the meaning of the term "counterfeit" as used in section 1029(e)(2).

The House Committee Report does not address the question of cellular telephones as "access devices," or the problem of cellular telephone "free riding" as a discrete issue. Reference is made to "transactions over the telephone by use of an account number," but the reference in that context is to use of a valid credit card account number to obtain money, goods or services other than use of the telephone system itself. H.R.Rep. No. 894, at 7, 1984 U.S.CODE CONG. & ADMIN.NEWS at 3692–93. The House Committee also noted that "[c]riminals have also developed numerous methods for obtaining valid account numbers," citing various forms of trickery over the telephone, but again referring to credit card account numbers. *Id.* at 8. The Senate Committee Report on S. 1870, a proposed "Credit and Debit Card Counterfeiting Act" approved by the Senate during the same session, makes similar references. *See* S.Rep. No. 368, 98th Cong., 2d Sess. 3 (1984), *reprinted in* 1984 U.S.CODE CONG. & ADMIN.NEWS, 3182, 3649.

■ The House Committee's reference to "credit cards, debit cards, account numbers, and combinations of these and other methods of obtaining money, goods and services" speaks of a legislative purpose principally, but not exclusively focused upon fraud involving traditional credit cards. At the same time, the legislative history confirms that section 1029 does not extend to all "other methods of obtaining money, goods and services," only those methods capable of use in connection with accounts. Section 1029(e)(2)'s reference to a "code, account number, or other means of account access" reflects a theme central to the legislative purpose underlying the statute, one that defines the outer boundaries of its reach.

#### UNITED STATES v. McNUTT

Relying on *United States v. McNutt,* 908 F.2d 561 (10th Cir.1990), *cert. denied,* 498

---

10. "As the credit industry and other parts of our society enlarges its capacity in the use of computer technology, for example in the use of 'smart cards' *which contain microchips* and are themselves a form of 'passive' computer, there is

every indication that the criminal element is enlarging its capacity in this area." H.R.Rep. No. 894, at 4, 1984 U.S.CODE CONG. & ADMIN.NEWS at 3690 (emphasis added).

U.S. 1084, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991), the defendant argues that the indictment fails to plead an essential element of the offense because it does not allege that he used a cellular telephone as a "means of account access" to an account which was billed, or that he trafficked in cellular telephones that would be used for that purpose. In *McNutt*, the court of appeals held that a satellite television "descrambler," as a passive receiver of electromagnetic transmissions, did not represent an unauthorized "means of account access" within the meaning of 18 U.S.C. § 1029. Use of the descrambler did not entail actual access to specific accounts. The device created no fraudulent debit or credit in any identifiable customer account.

The Tenth Circuit characterized the legislative intent underpinning section 1029 in *McNutt* as follows:

> In enacting § 1029, "Congress was focused on the fraudulent use of [access] devices in connection with credit transactions...." *United States v. Blackmon*, 839 F.2d 900, 913–14 (2d Cir.1988)[.] Congress sought to address "the growing problem in counterfeit credit cards and unauthorized use of account numbers or access codes to banking system accounts...." H.R.Rep. 894, 98th Cong. 2d Sess., *reprinted in* 1984 *U.S.Code Cong. & Admin.News* 3182, 3689. Congress sought to include in its definition of access devices "credit cards, debit cards, account numbers and combinations of these and other methods of obtaining goods and services." *Id.* at 3705....

908 F.2d at 563. *McNutt* rejected the government's suggestion that obtaining a "free ride" on the satellite television system through use of a cloned descrambler represented use of an "access device":

> In advancing this argument, however, the government has mistaken economic losses for actual monetary losses resulting from discrete transactions reflected in the company's accounting records. *See* R. Posner, *Economic Analysis of Law* § 1.1 at 6–7.

> As used in § 1029, an account constitutes "a formal record of debits and credits." *See Random House Dictionary of the English Language* 13 (2d ed. 1987). Unlike the unauthorized use of credit cards or long distance telephone access codes, use of cloned descrambler modules does not debit legitimate subscribers' accounts; no additional charges are accrued as a result of the unauthorized use....

908 F.2d at 563–64.

"Unquestionably," the Tenth Circuit observed, the "operators of satellite television services suffer *economic* losses from the revenue foregone due to the use of cloned descrambler modules" for the purpose of "free riding" on the system. *Id.* at 564 (emphasis in original). The fact of economic loss, however, does not transmute a cloned satellite descrambler into an "access device" or a "means of account access" within the meaning of section 1029:

> "[W]e find nothing in the plain wording, legislative history or judicial interpretation of § 1029 which would lead us to believe that Congress intended that statute to apply to anything other than direct accounting losses."

*Id.* (citing *United States v. Blackmon*, 839 F.2d at 913–14).[11]

Defendant Brady argues that like the descrambler in *McNutt*, the cellular telephones at issue in this case did not create debits or credits in any identifiable customer accounts, and that the Government is not prepared to allege or prove otherwise.

**"Free Riding" as a "Means of Account Access"**

The Government asserts that use of altered cellular telephones to "free ride" on the cellular telephone system causes "direct accounting losses" to the carriers within the meaning of *McNutt* without need of proof of actual access to individual customer accounts. Defendant Brady, on the other hand, argues that *McNutt* requires "a debit to a discrete and legitimate account in order to constitute an offense" under section 1029(a)(1). (Defen-

---

**11.** The Tenth Circuit went on to uphold the defendant's conviction under another, more suitable statute, 18 U.S.C. § 2512. *See also United* *States v. Splawn*, 982 F.2d 414 (10th Cir.1992) (en banc).

dant's Memorandum, in Support of His Motion for an Order Dismissing the Indictment, dated March 3, 1993, at 4.) Absent an identifiable account record linking the phone used to a legitimate subscriber account, defendant asserts that "the Government can only allege that the phones in question share with all other cellular phones the capacity to 'free ride' the cellular system," which capacity "does not make a phone a 'counterfeit access device' under § 1029." (*Id.* at 6, 7.)

The Government has not cited to any reported cases construing section 1029 as being applicable to cellular telephones used to "free ride," and this court has located none.[12] However, the few reported cases applying section 1029 in the context of telephone communications in general seem instructive.

In *United States v. Teehee*, 893 F.2d 271 (10th Cir.1990), the United States Court of Appeals for the Tenth Circuit affirmed the conviction under section 1029 of a defendant who had obtained and resold thirty-nine "unauthorized access devices" in violation of section 1029(a)(2). As the court noted, "The access devices in question were long-distance telephone access codes issued by U.S. Sprint Communications Company ("U.S. Sprint") to its customers." *Id.* at 272. U.S. Sprint had given credits totalling $837,356.43 "to its legitimate customers to whom said authorization codes were issued for unauthorized long distance calls not made by such customers." *Id.* Notably, the "means of account access" was not the telephone equipment from which the unauthorized calls were ultimately placed.

In *United States v. Brewer*, 835 F.2d 550 (5th Cir.1987), the defendant had gathered a number of unassigned long distance telephone access codes by placing numerous calls to a telephone company's toll free number and "trying out various combinations until he found one that the computer would accept as valid." *Id.* at 551. The company in turn "became concerned about a large number of calls being charged to unassigned personal access codes" and complained to Southwestern Bell and the Secret Service.[13] The Fifth Circuit had no difficulty bringing telephone access codes within the reach of section 1029:

> Although its legislative history suggests that the primary focus of section 1029 was to fill cracks in the criminal law targeted at credit card abuse, we are persuaded that Brewer's conduct is reached by a practical reading of the statute. Both the Senate and House Reports on the statute state that the definition of "access device" was intended to be "broad enough to encompass technological advances." Both reports also make specific reference to personal identification codes such as those used to obtain cash from automatic teller machines. Thus, although apparently this is the first case to do so, we need not stretch to read long distance access codes into the section 1029 definition of "access device."

*Id.* at 553 (footnotes omitted). In *Brewer*, as in *Teehee*, the pertinent "access device" subject to sanction under section 1029 was the valid telephone access *code*, not the particular telephone instrument used to gather it by tumbling various number combinations, or to place the calls charged to those accounts.

Similarly, in *United States v. Taylor*, 945 F.2d 1050 (8th Cir.1991), the Eighth Circuit affirmed the conviction of a defendant under section 1029(a)(2) who had gained access to the American Express computer system, presumably by wire, and "tried out various number combinations until he found one that the American Express computer would accept as valid." The defendant obtained and used

---

**12.** The court has identified two indictments filed in the United States District Court for the Central District of California which concern trafficking in counterfeit cellular phones or cellular phone chips, *United States v. Kenneth Steven Bailey*, No. CR–91–59 (C.D.Cal. Nov. 10, 1992), *appeal docketed*, No. 92–50721 (9th Cir. Dec. 4, 1992), and *United States v. Robert Dewayne Sutton and Dennis Mercer Allen*, No. CR–91–61 (C.D.Cal. filed Jan 22, 1991). In *Bailey*, Judge Tashima granted defendant's motion for judgment of acquittal un-

der Fed.R.Crim.P. 29(c). That matter is now on appeal.

**13.** As *Brewer* explains, "A customer calls TNT's toll free phone number, punches in a personal access code, and if the access code is determined to be valid by the TNT computer, the customer gets a dial tone enabling him to place a long distance call. The call is then billed to the customer through the access number." 835 F.2d at 551.

" 'valid but as yet unassigned' " American Express credit card account numbers together with fictitious names to obtain over $6,500 worth of goods and services from restaurants, hotels and limousine services. The Eighth Circuit concluded that "[t]he unauthorized use of *an account number covering a valid, but unassigned* account, constitutes an access device by which the fraud was perpetrated. *See United States v. Teehee,* 893 F.2d 271, 272 (10th Cir.1990); *United States v. Brewer,* 835 F.2d 550, 552–53 (5th Cir. 1987)." *Id.* at 1051 (emphasis added).

■ *McNutt* requires that an "access device" be capable of gaining access to an "account," i.e., "a formal record of debits and credits." 908 F.2d at 563. In *Teehee, Brewer* and *Taylor,* each of the defendants were prosecuted for fraudulent use of an access device. And in each instance, the "access device" was an identifiable, valid account number or access code used by the defendant. In each case, transactions in which they were used were actually identified in connection with particular accounts.

Much of the counterfeiting of credit cards complained of in the legislative history of section 1029 involved fraudulent abuse of "valid" account numbers. *See* H.R.Rep. No. 894, at 7–8, 1984 U.S.CODE CONG. & AD-MIN.NEWS at 3693 ("valid account numbers can be used improperly in various ways....") Presumably, a "valid" account number would be one against which value would be given and debits would specifically be entered, as described in *McNutt, Teehee, Brewer* and *Taylor.* Where a "valid but unassigned" account number is used, as in *Brewer* or *Taylor,* it follows that an account-specific record of "discrete transactions reflected in the company's accounting records" would still be created, as though there was

an actual customer to be billed. Access to an account through use of a "valid but unassigned" account number would thus render that account number an "access device" within the meaning of section 1029(e)(1).

A sensible reading of section 1029 which harmonizes *McNutt, Teehee, Brewer* and *Taylor* would thus require that an "access device" be one capable of gaining access to identifiable accounts for which records would in fact be created and maintained, as happens when one uses a "valid" customer account number. Absent pleading or proof that a defendant prosecuted for *use* of a cellular telephone actually gained access to an identifiable "valid" account, i.e., one against which debits, charges or credit transactions were recorded, such use would appear to fall beyond the scope of section 1029 as construed in *McNutt.*

### Count IV

The cellular telephone system differs in at least one important respect from the systems in *Teehee* and *Brewer.* The difference is a deliberate one, arrived at as a matter of business policy. Carriers offering cellular telephone service allow one call to be placed from any cellular telephone using *any* number that may be programmed into the phone. From the customers' standpoint, this approach permits cellular telephone subscribers to enjoy relatively easy placement of calls using their own phone even if they have travelled outside the geographic service area served by their original carrier.[14] From the carrier's standpoint, the cellular telephone system treats that first call as an opportunity to confirm the validity of the combination of ESN and MIN numbers transmitted by the cellular telephone instrument, using two sophisticated computer systems.[15] If placed

---

14. Roamer—A cellular telephone user who is a customer of a system in a market outside of the local cellular telephone system who accesses the local system while present in the area.

15. Witness DeRay Sudweeks identified the two systems used by Cellular One, one of two local carriers:

PRV—Positive Roamer Verification—a computer-based system used to verify valid cellular telephone ESN/MIN combinations assigned to authorized customers on any participating system. If the PRV identifies a particular combi-

nation as valid, the local cellular telephone system will permit telephone calls to be placed using that combination. If the combination is not identified as valid, the local system will deny service to a telephone using that combination. (Transcript of Hearing, 2/25/93, at 104:17–105:11 (Testimony of DeRay Sudweeks).)

Fraudulent Data Base—A computerized database application listing ESN and MIN combinations for cellular telephones which, e.g.,

using valid numbers, the call is then billed to the particular subscriber. If the computer does not confirm the transmitted combination as a valid match of customer or subscriber ESN and MIN numbers, further calls using the same combination are intercepted, effectively locking out further use of the system to place additional calls.[16]

Whether made using a valid ESN/MIN number combination or not, the cellular telephone system always permits the first call to be completed. "Free riding" takes repeated advantage of this policy, tumbling arbitrarily selected numbers to place a series of "first calls." In contrast to "cloning" of an existing unit, no valid customer account number is required to "free ride" and no valid customer account is billed. As one witness testified:

Q. And what Mr. Brady would do would be to use the ESN number and whatever other numbers he was using until he got the intercept and reprogram the phone?

A. Right. At that point in time, the system had shut him down and would not allow him to make further phone calls, so he was just tumbling.... You could tumble either the ESN or the MIN.

Q. And by doing it this way, would there be any charges made on any customer accounts?

A. No.

Q. Would there be any charges made on any billing records in the company, of Cellular One, any charges that you would mail to a legitimate customer?

A. No.

Transcript of Hearing, 2/25/93, at 105:18–106:7 (Testimony of DeRay Sudweeks).

With respect to Count IV of the indictment, the Government has already conceded that it is unable to prove that defendant Brady used an "altered" cellular telephone to gain access to a valid subscriber account to which his calls were billed.[17] Instead, the Government attempts to satisfy *McNutt* by

showing how "additional charges are accrued" through so-called "unmatched" calls, at least as they are treated in one carrier's bookkeeping.

Mr. DeRay Sudweeks, Director of Technical Operations for Cellular One in Salt Lake City, testified that the costs associated with calls placed using invalid ESN/MIN combinations are reported on a monthly basis:

THE WITNESS: ... We have a report that comes to my billing company on a monthly basis that are called unmatched calls, and its exactly that. It's an unmatched combination of MIN and ESN which is not assigned to a valid subscriber.

Q. So, there would be no bill on that?

A. There would be no bill. We would just eat whatever costs are associated with that call.

Q. You would?

A. Including from toll charges for long distance if the call happened to be long distance.

Q. Cellular One would?

A. Yes.

Transcript of Hearing, 2/25/93, at 106:13–25.

Mr. Fritz Aschauer, a technician also employed by Cellular One, testified in further detail regarding the handling of costs attributed to unmatched calls, particularly long distance calls:

Q. When you say long distance carriers, who are they?

A. Long distance carrier A.T.T., M.C.I., U.S. West. It depends on who happens to be in this particular part of the country.

\* \* \* \* \* \*

Q. Okay. Did Cellular One access the interstate capabilities of those long distance carriers?

A. Yes.

\* \* \* \* \* \*

---

have been reported as stolen. (*Id.* at 112:6–11.)

**16.** **Unmatched Call**—A telephone call placed through a cellular telephone using an ESN/MIN combination not assigned to a bona fide customer or subscriber. (Transcript of Hear-

ing, 2/25/93, at 106:14–17 (Testimony of DeRay Sudweeks).)

**17.** "MR. OLSON: ... We can not prove that legitimate—that is, identifiable subscriber accounts were accessed, ..." Transcript of Hearing, 3/1/93, at 237:12–14.

Q. Let's assume that one of the phones tumbled and did not access any customer account, all right, and yet it was an interstate call requiring use of long distance carrier facilities. From that theoretical use, would a bill be generated and sent to Cellular One?

A. Yes.

Q. All right. How does that work? . . .

A. . . . [W]e again are the customer to the long distance carrier. Any time our system is accessed and the long distance is accessed, the long distance company doesn't know it is a cellular phone being used to make the long distance call. It could be for all they know a phone right here right now.

So they send us a bill. We match the bill to our billing computer which matches the mobile number with the E.S.N., then in turn turns around and we bill the cellular customer for that exact amount that we are billed from the long distance carrier.

Q. All right. Let's assume for a moment an interstate call made without accessing an individual customer account. . . . In the case we have presented, no customer account exists. What happens to the charges from the long distance carrier with respect to your company?

A. I do believe we have to pay it and [that] being because we are the customer. . . .

Q. As I understand your testimony, an account is generated and [is] one that you pay?

A. An account is already present between Cellular One and all long distance carriers in the area.

Q. And that account is billed, and you pay it even in the case of a non-customer billed account?

A. Yes.

Transcript of Hearing, 2/26/93, at 124:2–126:6.

Mr. Vaughan Nelson, Director of Customer Service for Cellular One, testified with respect to charges for local cellular telephone calls:

Q. . . . When the Cellular telephone system is used locally, does Cellular One receive a bill for that air time?

A. Yes. We're billed by . . . our corporate office for x-number of cents per minute of use. And that's again if we can collect that or not, we—

Q. In the case of an individual access account, would it be correct to say [that] you simply send the bill out to an individual subscriber for that time?

A. Uh-huh (affirmative).

Q. Assuming that a call does not have an identifiable account, that it is an unidentified call, would you nonetheless be billed for that time?

A. For the amount that we're normally charged by corporate, yes. . . . Now, let me just mention we, of course, get a discount because we are the carrier. So the bills may appear, you know, 23 cents on the customer invoice. Our invoice from corporate would not be that high.

Transcript of Hearing, 2/26/93, at 136:7–137:3.

The Government maintains that the charges for "unmatched" calls handled as thus described represent a "direct accounting loss" to Cellular One within the meaning of section 1029 as construed in *McNutt.* In effect, the Government argues that access to the cellular carrier's *system* translates into access to the carrier's own accounts through which the cost of system usage is allocated within and between carriers.

Yet the same reasoning would seem to apply to use of the older, less sophisticated "blue boxes" used to gain access to the long distance telephone system. A so-called "blue box" uses no account number or access code at all; it emits a 2600 Hz tone which permitted the user to "free ride," to gain access to the system and place long distance calls which were not charged to any customer account.[18] *See, e.g., United States v. Foster,*

---

18. In some instances, individuals were able to free ride by whistling at the requisite 2600 Hz frequency, without using an electronic device at all. *See* KATIE HAFNER & JOHN MARKOFF, CYBERPUNK·

OUTLAWS AND HACKERS ON THE COMPUTER FRONTIER 18–19 (pap. ed. 1991) (one such user "discovered that the toy whistle buried in the Cap'n Crunch

580 F.2d 388 (10th Cir.1978); *United States v. Patterson*, 528 F.2d 1037 (5th Cir.), *cert. denied*, 429 U.S. 942, 97 S.Ct. 361, 50 L.Ed.2d 313 (1976). Long distance calls placed with blue boxes are listed in telephone company records in a fashion similar to the "unmatched" cellular calls described by the Government's witnesses. This court has not found a reported case in which a "blue box" used "for the purpose of circumventing the charges on interstate long-distance calls" has been deemed to be an account "access device" within the meaning of section 1029(e)(1) on the theory that the "blue box" gained access to the telephone company's own accounts. *See, e.g., United States v. Disla*, 805 F.2d 1340 (9th Cir.1986).

While the economic losses arising from "unmatched calls" appear somewhat more tangible than those resulting from passive reception of satellite transmissions in *McNutt*, the Government in this case simply cannot establish a factual connection between any of those losses and defendant's alleged use of an account "access device."[19] Where it cannot be shown that a defendant gained access to one or more identifiable accounts, the Government cannot establish use of an access device in violation of section 1029(a)(1). Here, the conceded failure of the Government's proof on that point renders Count IV of the indictment insufficient as a matter of law.

At least one court has reached the same conclusion when presented with a closely similar issue. In *United States v. Bailey*, No. CR–91–59 (C.D.Cal. Nov. 10, 1992), *appeal docketed*, No. 92–50721 (9th Cir. Dec. 4, 1992), the United States District Court for the Central District of California, Judge Tashima presiding, granted a motion for judgment of acquittal under Fed.R.Crim.P. 29(c), overturning the defendant's conviction for vi-

olation of section 1029(a)(1) and (a)(4). Defendant was charged with producing EPROM[20] microchips which when installed in cellular phones, would enable the user to "free ride" by bypassing the phone's original ESN. The court held that "an EPROM is not an 'access device'" for purposes of section 1029:

> The issue is whether an EPROM is an "access device," as that term is used in § 1029. The statute defines the term as:
>
>> The term "access device" means any card, plate, code, account number, *or other means of account access* that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or other thing of value.
>
> 18 U.S.C. § 1029(e)(1) (emphasis added). Although the legislative history is somewhat sparse, all indications are that Congress was concerned with exactly what the statute says, access to accounts, primarily bank or credit card accounts.
>
> Here, defendant did not access any account—he accessed the system without accessing an account. In this respect, this case is like *United States v. McNutt*, 908 F.2d 561 (10th Cir.1990), *cert. denied*, [498 U.S. 1084] 111 S.Ct. 955 [112 L.Ed.2d 1043] (1991). This case is unlike the cases relied on by the government, *e.g., United States v. Taylor*, 945 F.2d 1050 (8th Cir. 1991), where the defendant used a valid though unassigned credit card account number. Here, it bears repeating, defendant used no account number *or any other device to access an account.* It the government's argument were accepted, the term "access device" would have no limitation and the statute would be turned into a general theft statute. Under the government's argument a crow bar would be an

---

cereal box matched the phone company's 2600 Hz tone perfectly.")

**19.** Without this nexus between the defendant's alleged conduct and identifiable losses in discrete accounts, there would also be no evidentiary basis in the record for evaluating specific offense characteristics under the applicable Federal Sentencing Guideline, § 2F1.1. *See id.* at § 2F1.1(b)(1).

**20.** **EPROM**—Erasable programmable read-only memory. "EPROMs are nonvolatile memory chips that are programmed after they are manufactured.... EPROMs differ from PROMs [Programmable Read Only Memory] in that they can be erased, generally by removing a protective cover from the top of the chip package and exposing the semiconductor material to ultraviolet light, and can be reprogrammed after having been erased." MICROSOFT PRESS COMPUTER DICTIONARY 131 (1991).

"access device" if it were used to pry open an ATM machine and empty its contents.

Undoubtedly, there is a form of theft involved here and defendant may be subject to prosecution under state law. However, reading the term "access device" reasonably and in keeping with the legislative intent, and bearing in mind the rule of strict construction of criminal statutes, the court concludes that the conduct here does not violate § 1029, *i.e.,* an EPROM is not an "access device."

Order on Motion for Acquittal, dated November 10, 1992, at 2–3. *Compare United States v. Koenig,* 952 F.2d 267 (9th Cir.1991) (use of ATM account and PIN numbers to obtain money).

Good cause thus appearing therefor, Count IV of the Indictment is dismissed with prejudice.

### Counts I, II and III

█ Counts I, II and III of the indictment allege "trafficking"[21] in access devices, as opposed to their actual use by the defendant. Actual fraudulent use of the cellular telephone units addressed in these counts does not appear to be required to establish a violation of section 1029(a)(1); according to section 1029(e)(1), the term "access device" refers to a means of account access "that can be used" to obtain money, goods, services or other value.

As noted above, there appears to be no question that trafficking in "cloned" cellular phones would violate section 1029(a)(1); the access device in that instance is the valid ESN/MIN combination tied to a specific subscriber account which has been copied from another cellular phone unit.

Transfer of cellular phones intended for "free riding" presents a more difficult question. "Free riding" necessarily involves gaining access to the cellular telephone system, and using arbitrary "tumbled" MIN and/or ESN numbers necessarily adds to the volume of unmatched calls, as described by the witnesses from Cellular One. As explained with reference to Count IV, however, that alone is insufficient to establish an unlawful use of an access device under section 1029.

To violate section 1029(a)(1) by "trafficking," one must transfer to another a counterfeit access device "knowingly and with intent to defraud." The House Committee Report on H.R. 5616 offers some guidance concerning the requisite intent: "The Committee intends that the term 'with the intent' have the same culpable state of mind as the term 'purpose' as used in the proposed Model Penal Code (§ 2.02)."

> The distinction from a knowing state of mind was recently restated by Justice Rehnquist, "as we pointed out in *United States v. United States Gypsum Co.,* 438 U.S. 422, 445 [98 S.Ct. 2864, 2877, 57 L.Ed.2d 854] (1978), a person who causes a particular result is said to act purposefully if 'he consciously desires that result, whatever the likelihood of that result happening from his conduct,' while he is said to act knowingly if he is aware 'that the result is practically certain to follow from his conduct, whatever his desire may be as to that result.' " *United States v. Bailey,* 444 U.S. 394, 404, 100 S.Ct. 624, 631–32, 62 L.Ed.2d 575 (1980).

H.R.Rep. No. 894, at 17, 1984 U.S.Code Cong. & Admin.News at 3702–03 (footnote omitted).[22] Thus one trafficking in access

---

**21.** The term "traffic" means to "transfer, or otherwise dispose of, to another, or to obtain control of with intent to transfer or dispose of," without reference to subsequent use. 18 U.S.C. § 1029(e)(5).

**22.** The phrase "with intent to defraud," according to the Senate Committee Report,

> means that the offender has the conscious objective, desire, or purpose to "deceive another person, and to induce such other person in reliance upon such deception, to assume, create, transfer, alter, or terminate a right, obligation or power with reference to property."

> It does not, however, require, that the offender have direct contact with the person who is ultimately defrauded. A counterfeiter may deal with a distributor who is fully aware that the cards are phony, and is therefore not a victim of fraud. However, the manufacturer clearly intends to defraud the innocent merchant. Otherwise his product would have no value.

S.Rep. No. 368, at 6, 1984 U.S.Code Cong. & Admin.News at 3652 (footnotes omitted) (citing *Black's Law Dictionary* 381 (5th ed. 1979)).

devices in violation of section 1029 must act purposefully, i.e., consciously desire that they be put to an unlawful use, which under section 1029 requires access to an account.

Here again, the Government argues that access to the cellular carrier's *system* translates into access to the carrier's own accounts through which the cost of system usage is allocated within and between carriers, rather than accounts assignable to individual subscribers. Yet if making unidentifiable "unmatched calls" is not a "use" of an access device punishable under section 1029(a)(1), it would seem inconsistent to hold that intending that same use when transferring a cellular phone would violate that same section.

The Government's argument strays from the central thrust of the statute, which concerns account numbers and codes of the kind that identify individual customers and customer accounts, particularly "valid" customer accounts against which unauthorized charges can be billed. As the Second Circuit observed in *United States v. Blackmon,* a case relied upon in *McNutt,* "The legislative history refers only to the concern over increasingly sophisticated schemes by counterfeiters and traffickers to defraud financial institutions by *obtaining account numbers* or stolen and lost access cards *which are then used in ordinary credit transactions. See* H.R.Rep. No. 894, 98th Cong., 2d Sess. 4–8 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3689." 839 F.2d at 914 (emphasis added)." Section 1029's definition of "access device," the court explained, "reinforces the impression that Congress was focused upon the fraudulent use of such devices in connection with credit transactions." *Id.*

While *Teehee* and *Brewer* read section 1029 broadly enough to encompass the fraudulent use of valid long distance customer access codes, the analogy to credit card customer accounts and the credit transactions emphasized in *Blackmon* breaks down where the intended use of a cellular phone unit only adds to the systemwide cumulation of tele-

phone charges "unmatched" to any identifiable customer account.[23] In the language of *McNutt,* "free riding" on the cellular telephone system plainly "does not debit legitimate subscribers' accounts." 908 F.2d at 563–64. Without a valid ESN/MIN combination, a cellular phone *cannot* gain access to debit legitimate subscribers' accounts.

Where there are "two rational readings of a criminal statute, one harsher than the other," the court should adopt the harsher reading "only when Congress has spoken in clear and definite language." *McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987). " 'There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute.' " *Id.* (quoting *Fasulo v. United States,* 272 U.S. 620, 629, 47 S.Ct. 200, 202, 71 L.Ed. 443 (1926)). Section 1029 does not reach every means of fraudulent access to services, goods or money. It specifically penalizes use or trafficking in devices which gain access *to accounts* through which services, goods or money may be obtained. Remembering that absent a valid ESN/MIN combination, a cellular phone cannot gain access to valid customer accounts, the court must adopt a reading of the statute narrower than that suggested by the Government, and conclude that a cellular phone, including one altered in the fashion alleged by the Government, and transferred with the intent and purpose to "free ride," is not an "access device" within the meaning of section 1029.

■ Nor is the Court persuaded by the Government's argument that, in this instance, the "access device" issue remains a question for the jury. (*See* Memorandum of the United States in Support of its Opposition to Plaintiff's Motion to Dismiss the Indictment, dated March 19, 1993, at 3–5 (citing 1A Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 40.01, at 40–11, 40–12 (rev. ed. 1993)).) Where the Court has before it "the government's version of the facts through the testimony given by government

---

**23.** The Government's witnesses have testified that every cellular phone is capable of having its MIN and ESN numbers "tumbled" through reprogramming using the unit's own keypad. Thus every cellular phone "can be used" to obtain "first call" telephone service without the necessity of an access device in the form of an identifiable, valid account number or access code.

witnesses and the statements made by government counsel at the evidentiary hearing," the Court is not merely presented with "the ordinary case arising on a motion to dismiss the indictment, as under Rule 12(b), Fed. R.Crim.P., for failure to state an offense." *United States v. Brown*, 925 F.2d 1301, 1304 & n. 8 (10th Cir.1991). Rather, as the United States Court of Appeals for the Tenth Circuit has observed, in such circumstances, "it is permissible and may be desirable where the facts are essentially undisputed, for the district court to examine the factual predicate for an indictment to determine whether the elements of the criminal charge can be shown sufficiently for a submissible case." *Id.* As the *Brown* court points out, Rule 12(b) "allows pretrial determination of any motion which can be resolved without trial of the general issue." *Id.* Moreover, "Rule 12(e) allows the court to consider factual issues in determining a pretrial motion." *Id.* (paraphrasing *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir.1988)).

As explained above, unless the Government is prepared to prove that an altered cellular phone was transferred by the defendant with the intent that it serve as a "clone" bearing a valid ESN/MIN access code combination—a true account "access device"—it cannot establish a violation of section 1029(a)(1) for purposes of Counts I, II or III. As presently framed, and in light of the essentially undisputed testimony and proffer of evidence by the Government at the evidentiary hearing, the language of Counts I, II and III referring to "an altered cellular telephone, permitting unauthorized access to telephone services" is not grounded upon a factual predicate sufficient to show a submissible case as to a legally sufficient "access device," an essential element of the offense.[24]

For the reasons set forth above, Counts I, II and III of the Indictment are dismissed without prejudice.

---

**24.** An indictment must "satisfy the Fifth Amendment requirement that a grand jury has considered and found all elements to be present," *United States v. Shelton*, 848 F.2d 1485, 1494 (10th Cir.1988). " '[A] sufficient indictment is required to implement the Fifth Amendment guaranty and make clear the charges so as ... to avoid [the defendant's] conviction on facts not found, or perhaps not even presented to, the grand jury that indicted him.' " *Id.* (quoting *United States v. Radetsky*, 535 F.2d 556, 561–62 (10th Cir.1976)). Inferring that the indictment in this case was obtained upon the same factual predicate as presented at the evidentiary hearing, the Government cannot now salvage the "access device" element of the present Indictment through reliance on additional facts not adduced at the hearing and not presented to the grand jury. However, that does not prevent resubmission of a matter to the grand jury upon a sufficient factual or legal predicate.