**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Clinton L. WATSON, Defendant–Appellant.**

No. 96–10240.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 1997.

Withdrawn from Submission May 19, 1997.

Resubmitted June 11, 1997.

Decided July 7, 1997.

Sanford Svetcov, Landels Ripley & Diamond, San Francisco, CA, for defendant–appellant.

Parker Singh, Assistant United States Attorney, San Jose, CA, for plaintiff–appellee.

Before: HUG, Chief Judge, and GOODWIN and HAWKINS, Circuit Judges.

HUG, Chief Judge.

In this appeal, we are asked to decide whether cellular telephone cloning was a crime under 18 U.S.C. § 1029 prior to the time that Congress amended that statute in October 1994. This case also concerns whether the district court erred when it allowed the suppressed contents of the defendant's safe to be introduced into evidence. Finally, we must decide whether the district court erred in calculating the defendant's sentence.

## I. FACTS AND PRIOR PROCEEDINGS.

Each cellular phone manufactured is assigned an electronic serial number ("ESN"), similar to the vehicle identification number found on every car's dashboard. When a cellular telephone is connected to a service provider, it is also assigned a mobile identification number ("MIN"). The combination of these two numbers identifies the cellular phone user, as it is programmed into a memory chip in the phone to obtain service. When a cellular phone customer dials the number he desires to call, the number dialed, as well as the MIN–ESN combination of the cellular phone from which the call was made, are transmitted to the customer's service provider, where a computer verifies that the MIN transmitted matches the ESN of the phone from which the call was made. Once the numbers are found to match, the cellular phone provider connects the call.

Cellular phone cloning involves the use of electronic scanning and computer programming equipment to erase and reprogram the electronic chip containing a phone's ESN–MIN combination with the account number of another user so that the calls made on the modified phone are charged to the other cellular phone user's account. Cellular phone cloning is often discovered when legitimate customers complain to their carriers about fraudulent calls appearing on their bills.

Such was the case here, as several customers notified the Cellular One company that their cellular phone bills had dramatically increased. Cellular One investigator, Tim Long, looked into the fraudulent use of these account numbers, after which he referred his investigation to the United States Secret Service. Long had ascertained that fraudulent calls made on over fifty different account numbers were going to the home of Clinton L. Watson, the defendant. Secret Service Agent Andrew Dooher found a piece of paper containing alphanumeric codings used to conceal ESNs in a search of Watson's garbage on April 15, 1994. Based on this information, Agent Dooher obtained a search warrant for Watson's home.

Agents searched Watson's home on April 21, 1994. They found ESN scanning and reading equipment, computers, and computer chip reprogramming equipment. They seized 38 cellular phones, approximately 600 stolen ESN–MIN combinations, and records indicating that Watson had produced and sold 1003 cloned cellular phones.

On April 28, 1994, a second warrant was procured and Watson's house was again searched because agents believed that they had accidentally left behind some cellular telephone chips from the first search. They encountered a safe which, while open during the first search, was now locked. The safe was seized. It was, however, later agreed that the safe and its contents would be returned unsearched to Watson. Before this transfer was completed, the safe was somehow opened, and was found to contain $8,400 cash and a $15,000 check.

On September 7, 1994, a grand jury indicted Watson for three violations of 18 U.S.C. § 1029 for the knowing possession, production, use, and trafficking of counterfeit access devices and access device equipment. Before trial, Watson moved to suppress the evidence found in the safe, and the parties stipulated that its contents should be suppressed. The district court found the safe to have been improperly seized and ordered it not to be introduced in the Government's case-in-chief.

Trial commenced September 18, 1995. In his opening statement, Watson's attorney, in an attempt to question the credibility of Government witnesses, mentioned the seized safe and the peculiar manner in which the Secret Service had gained access to its contents. On the following day, the Government questioned Secret Service Agent Dan Schott about the safe, as did defense counsel in

cross-examination. No objection was made. Agent Dooher was also asked about the safe during his testimony.

On the final day of trial, defense counsel moved for a mistrial, claiming error in admitting testimony regarding the safe and its contents. The district court denied the motion.

A jury convicted Watson on all three counts on September 25, 1995. On May 28, 1996, Watson was sentenced to 60 months of incarceration and to a 12–month consecutive sentence for violation of his probation relating to a prior fraud conviction. Watson timely appealed.

II. *WHETHER CELLULAR PHONE CLONING WAS A CRIMINAL ACTIVITY PRIOR TO THE OCTOBER 1994 AMENDMENT OF 18 U.S.C. § 1029.*

 Watson argues that he committed no crime. He contends that 18 U.S.C. § 1029 was aimed at credit card and computer fraud, and that Congress did not criminalize the cloning of cellular telephones until it amended 18 U.S.C. § 1029 in October 1994. We disagree. In *United States v. Bailey,* 41 F.3d 413, 418 (9th Cir.1994), we held that modifying a cellular phone to fraudulently gain access to cellular telephone services violated the pre-October 1994 version of section 1029. Under *Bailey,* Watson's activities violated the version of section 1029 that is applicable to this case. Moreover, it is clear that Watson was not a good faith actor laboring under the misapprehension that his cellular phone cloning activities were legitimate. *United States v. Ragen,* 314 U.S. 513, 524, 62 S.Ct. 374, 378–79, 86 L.Ed. 383 (1942); *see also United States v. Griffin,* 589 F.2d 200, 207 (5th Cir.1979) ("[T]he requirement that statutes give fair notice cannot be used as a shield by one who is already bent on serious wrongdoing."). We will not reverse.

III. *WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT ALLOWED THE SUPPRESSED CONTENTS OF WATSON'S SAFE TO BE INTRODUCED INTO EVIDENCE.*

The district court found that the safe taken from Watson's home had been improperly

seized. It then suppressed the items found therein, and ordered the evidence found in the safe "not to be used in the government's case against Clinton Watson." Watson contends that the district court abused its discretion by allowing the Government to elicit testimony regarding the seized contents of his safe during the Government's case-in-chief. We agree.

 The district court allowed the introduction into evidence of the fruits of a constitutionally improper search in the Government's case-in-chief, bolstering the challenged credibility of Government witnesses and providing further substantive evidence against Watson. This was error. Illegally obtained evidence "is inadmissible in the government's direct case, or otherwise, as substantive evidence of guilt." *United States v. Havens,* 446 U.S. 620, 628, 100 S.Ct. 1912, 1917, 64 L.Ed.2d 559 (1980).

 Watson's attorney did not, however, object to the Government's elicitation of testimony regarding the seized safe's contents from Agents Dooher and Schott. Watson, therefore, should be deemed to have waived his objection to the introduction of this evidence, and our review is for plain error. *United States v. Hinton,* 31 F.3d 817, 824 (9th Cir.1994); Fed.R.Crim.P. 52(a).

 Under the test set forth in *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993), before we can correct an error not raised at trial such as this, there must be (1) "error," (2) that is "plain," and (3) that "affects substantial rights." Only if these three conditions are met, and we also find that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," may we then exercise our discretion to correct the error. *Id.* (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985)).

 It is clear that we cannot notice the error raised by Watson under the exacting

requirements of the *Olano* test. While it is perhaps arguable that the error "affected substantial rights," there is no question that the error did not "seriously affect the fairness" of Watson's trial. The evidence against Watson was clear and overwhelming. A legal search of his home revealed a veritable cellular phone cloning factory. Police seized computer programs, ESN scanning and reading equipment, computers, and computer chip reprogramming equipment, along with a chip in a reprogramming machine undergoing the cloning process. They also seized 38 cellular phones, approximately 600 stolen ESN–MIN combinations, and records indicating that Watson had produced and sold 1003 cloned cellular phones. Testimony from Watson's associate, Jimmy Ly, indicated that Watson had invented the computer program to clone cellular phones, and that he had recruited and trained Ly to clone cellular phones. Calls using at least 50 different stolen cellular phone account numbers were made to Watson's residence.

Thus, even though the money and documents seized from the safe may have indeed provided additional proof of Watson's guilt, this evidence was truly ancillary to the vast array of evidence that formed the foundation of the Government's case against Watson. This erroneously introduced evidence did not affect the outcome of Watson's trial. "No 'miscarriage of justice' will result here if we do not notice the error." *Johnson v. United States,* — U.S. —, —, 117 S.Ct. 1544, 1550, 137 L.Ed.2d 718 (1997) (quoting *Olano,* 507 U.S. at 736, 113 S.Ct. at 1779). We will not reverse.

IV. *WHETHER THE DISTRICT COURT ERRED IN CALCULATING THE AMOUNT OF LOSS ATTRIBUTABLE TO WATSON'S FRAUDULENT CONDUCT.*

■ The district court enhanced Watson's base offense level under U.S.S.G § 2F1.1, based on the estimated amount of loss resulting from Watson's fraud. Watson contends that the twelve-level enhancement exceeded what was warranted in this case. He argues instead that a ten-level enhancement would have been appropriate.

The district court based the twelve-level enhancement on the recommendation of the presentence report, which noted that trial evidence indicated the actual dollar loss from 156 of the 600 ESN–MIN combinations seized in the search of Watson's residence to be $456,632. An average loss per combination based on this figure is $3,030. The presentence report, therefore, concluded that the "estimated or extrapolated loss figure for the 600 combinations is approximately $2,000,000." Accordingly, the presentence report recommended a twelve-level enhancement under the U.S.S.G. § 2F1.1 tables.

Application Note 8 to U.S.S.G. § 2F1.1 explains how fraud loss estimates should be calculated by the district court. It reads:

> [T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.

U.S.S.G. § 2F1.1, comment (n.8). As the comment states, the estimated loss resulting from Watson's fraud "need not be determined with precision." *Id.* It need only be "reasonable." *Id.* Because the number adopted by the district court was based upon an average actual loss resulting from 156 ESN–MIN combinations posting traceable losses at the time of sentencing, multiplied by the approximate number of ESN–MIN combinations taken from Watson's home, it cannot be said that the district court was unreasonable in estimating Watson's loss at around two million dollars, well within the Guideline range calling for a twelve-level enhancement. The district court did not, therefore, clearly err. *United States v. Vargas,* 67 F.3d 823, 825 (9th Cir.1995).

V. *WHETHER THE DISTRICT COURT ERRED IN ENHANCING WATSON'S SENTENCE FOR HIS ROLE AS AN ORGANIZER OR LEADER.*

■ Watson contends that, in calculating his sentence under the Guidelines, the dis-

trict court improperly adjusted the offense level four levels upward because Watson was an "organizer, leader, manager, or supervisor" within the meaning of U.S.S.G. § 3B1.1. Our review is for clear error. *United States v. Ponce,* 51 F.3d 820, 826 (9th Cir.1995). In fact, the district court's adoption of the presentence report is sufficiently reliable to support its application of U.S.S.G. § 3B1.1. *See United States v. Rigby,* 896 F.2d 392, 394 (9th Cir.1990).

It is thus apparent that the district court did not clearly err in concluding that Watson was a "leader" or "organizer" under U.S.S.G. § 3B1.1. The district court adopted the findings the recommendations of the presentence report. *Rigby,* 896 F.2d at 394. But even had the district court's conclusion not been based on the presentence report's recommendations, the record demonstrates an adequate basis upon which the district court could base such a finding. The record shows that Watson was associated with 1003 sales of cloned cellular phones, that Watson possessed at least 600 stolen ESN–MIN combinations, and that Watson was the creator of the computer program used to clone the cellular phones at issue in this case. The record reveals that Watson created a means of continually altering a cellular phone's ESN–MIN combination, so as to allow its fraudulent lifetime use. Finally, the record shows that Watson trained others how to clone cellular phones and sold equipment to do so along with his expertise. In short, the district court had ample grounds upon which to conclude that Watson merited a four-level sentence enhancement under U.S.S.G. § 3B1.1 for being a "leader" or "organizer." The district court did not clearly err.

**AFFIRMED.**