**UNITED STATES of America,**
**Appellee,**

v.

**Ashraf Yousef ABOZID, Mohsin**
**Rashid, Parvez Ali,**
**Defendants,**

**Isaac AGHA, aka Hazem Agha,**
**Defendant–Appellant.**

No. 99–1284.

United States Court of Appeals,
Second Circuit.

Argued Sept. 26, 2000.

Decided July 20, 2001.

Ellen B. Resnick, Law Offices of Alan S. Futerfas, New York, NY, for Defendant–Appellant.

Laurie A. Korenbaum, Assistant United States Attorney (Mary Jo White, United States Attorney for the Southern District of New York, Andrea L. Labov, Assistant United States Attorney, of counsel), New York, NY, for Appellee.

Before WINTER, LEVAL, and STRAUB, Circuit Judges.

WINTER, Circuit Judge:

Isaac Agha appeals from a conviction by a jury before Judge Metzner for violating 18 U.S.C. § 371 by conspiring to traffic in or use unauthorized access devices to defraud, *see* 18 U.S.C. § 1029(a)(2), and to commit wire fraud, *see* 18 U.S.C. § 1343. He was also convicted of a substantive violation of Subsection 1029(a)(2). He was sentenced by Judge Cedarbaum.

Briefly stated, Agha was the owner of a travel agency, Agha Budget Travel, accredited by the Airline Reporting Corporation ("ARC"). Using his agency's unique ARC account number, Agha created a large number of valid airline tickets without orders from customers, sold them at a deep discount to individuals or other agencies, and pocketed the cash without reimbursing the airlines. In travel-agency jargon, this was a "bust out." For this, Agha was convicted of conspiring to violate, and violating, Subsection 1029(a)(2). The first issue on appeal is whether a validated airline ticket is an "access device" under Subsection 1029(e)(1). We hold that it is. The second issue is whether Agha "obtained" the validated tickets with the intent to defraud, as required by the statute. We hold that his creation of validated tickets does not fall within the word "obtained" as used in Subsection 1029(e)(3). However, those who purchased the tickets from Agha did violate Subsection 1029(a)(2), and he conspired with them to commit, and aided and abetted, those crimes. We therefore affirm.

## BACKGROUND

We of course view the evidence in the light most favorable to the government. *See United States v. Glasser,* 443 F.2d 994 (2d Cir.1971). Moreover, we "credit all inferences and credibility assessments that the jury might have drawn in favor of the government." *United States v. Kinney,* 211 F.3d 13, 17 (2d Cir.2000) (internal quotation marks, brackets, and citations omitted).

a) *The Commercial Context*

ARC is a corporation jointly owned by approximately 156 airlines that do business in the United States. The functions of the organization are to qualify or accredit travel agencies to sell tickets for use on those airlines and to facilitate and monitor the transfer of resultant revenues from the agencies to the airlines. *See generally United States v. Germosen,* 139 F.3d 120, 123 (2d Cir.1998) (describing functions of ARC). When a travel agency is qualified or accredited by ARC, it receives an ARC account number and a small metal plate embossed with that number. It also receives roughly 156 similar metal plates with airline identification numbers for each of the airlines that jointly own ARC. ARC prints and numbers blank airline ticket stock that it distributes to qualified agencies. The numbers are used by ARC to record which agency possesses which tickets and to monitor the volume of outstanding ticket stock held by each agency.

A blank ticket is worthless until validated. Validation requires that the ARC account number of the particular travel agency, the airline identification number of the service provider, and the purchaser's travel itinerary be imprinted upon the ticket. This imprinting can be done in two ways. One can write out the ticket by hand and imprint the account and airline identification numbers by using the metal plates, much like a manual credit-card machine. Or, one can generate a ticket on a computer with the ARC account number, airline identification number, and itinerary. Either method produces a ticket that has a specified dollar cost and entitles the holder to airline travel services.

The customer either pays the travel agency for the ticket or charges the ticket to a credit card. If the customer pays by credit card, the particular airline receives the fare directly from the credit card company. But if the customer pays the agency directly, the agency is obligated to transfer the revenue, save for a retained commission. Each agency has a credit relationship with the airlines under which the agency opens a bank account to which

ARC has access. The agency is required to deposit into this account cash (less commission) received from customers for tickets. ARC receives weekly sales reports from the agencies, withdraws the appropriate amount of money from the agencies' accounts, and distributes it to the appropriate airline. If an agency's account contains insufficient funds to cover amounts owed to an airline, the airline generates a "debit memo" stating the amount of the deficiency and demands payment from the agency. Each agency must also provide collateral to ARC to cover deficiencies in the account. The security required of Agha Budget Travel by ARC was a letter of credit in the amount of $20,000.

### b) *The "Bust Out"*

When Agha Budget Travel became ARC-accredited in 1988, it received its ARC account number and metal plate, the airline-identification-number plates, and a supply of blank ticket stock. In May 1993, Agha Budget Travel ordered and received from ARC an unusually large volume of ticket stock. Before late July 1993, Agha Budget Travel's average weekly cash sales had been approximately $2,300, and credit card sales were slightly larger. However, its last weekly sales report, submitted to ARC in late July, showed $176,617 in cash sales and no credit card sales whatsoever.[1] No further sales reports to ARC and no deposits to the bank account were made, although the agency continued to print and sell at deep discounts for cash large numbers of tickets that bore its ARC account number. When the "bust out" was concluded, the airlines that honored the tickets were owed nearly $1 million.

### c) *The Prosecution*

Appellant was indicted on two counts. He and Mohsin Rashid, Paravez Ali, and Yousef Abozid were charged with conspiring to traffic in and use unauthorized access devices and to commit wire fraud from at least June 1993 through September 1995, in violation of 18 U.S.C. § 371 (count one). Appellant was also charged with one substantive count of trafficking in and using unauthorized access devices from at least June 1993 through June 1994, and with aiding and abetting others in the commission of that crime, in violation of 18 U.S.C. §§ 1029(a)(2) & 2.[2] The indictment alleged that the access devices in question were unauthorized airline tickets, each containing an ARC account number and a ticket number.

The jury convicted appellant on both counts. The district court imposed concurrent sentences of 46 months for each count.

## DISCUSSION

### (a) *Definition of "Access Device"*

Appellant argues first that a validated airline ticket—one containing the ARC account number, airline identification number, and customer itinerary—is not, as a matter of law, an "access device" under Section 1029. This was not an issue raised in the district court, but we may assume that an error going to the very heart of the charges against appellant would constitute "plain error." *See United States v. Sogomonian,* 247 F.3d 348, 352 (2d Cir.2001) (per curiam). We therefore review the district court's interpretation of the statute

---

1. Because credit card sales involve direct payments to the airlines bypassing an agency's bank account, they are not part of a bust-out scheme.

2. Although appellant was charged with aiding and abetting in the substantive count of trafficking and using unauthorized access devices, the district court declined to give an aiding and abetting charge to the jury.

*de novo*, starting with the statutory language. *See, e.g. United States v. Koh*, 199 F.3d 632, 636 (2d Cir.1999) (citing *United States v. Figueroa*, 165 F.3d 111, 114 (2d Cir.1998)).

Subsection 1029(a)(2) criminalizes the acts of anyone who

> knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices....

Subsection 1029(e)(1) defines "access device" as:

> any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

■ The application of Section 1029 to validated ARC airline tickets appears to be a novel issue.[3] We hold that such tickets are access devices within the meaning of Subsection 1029(e)(1) because they bear an account number that, when imprinted upon the ticket stock, along with the airline identification code and travel itinerary, accesses services of value provided under a credit relationship between the travel agency and the airlines.

Any airline that is a member of ARC will accept a validated ARC ticket for flights, and such a ticket therefore "can be used ... to obtain ... services." Appellant argues, however, that the ARC account number is not a "means of account access," as required by Section 1029, but is only a " 'numerical identifier' assigned by ARC to each accredited travel agency ... for its internal tracking purposes," with "no significance in a financial or accounting sense."[4] Appellant's Brief at 18, *United States v. Agha* (2d Cir.2001) (No. 99–1284). We disagree.

The evidence showed that, when imprinted with the ARC account number and other information, the ticket may be used to obtain services from the airlines, and that, with regard to cash sales, the ARC account number triggers an obligation on the travel agency's bank account to the airline that will, if the amount owed exceeds the sums in the account and security, lead to an extension of credit by the airline. Such a credit relationship satisfies the "account access" requirement in Section 1029. As the Ninth Circuit has held, "an account is a contractual relationship that makes possible the provision of goods, services, or money based on payment, or

---

**3.** We are aware of only a single case in which the government charged a defendant under Section 1029 for the fraudulent use of airline tickets. *See United States v. Smith*, Crim. A. No. 92–20011–01, 1992 WL 370622 (D.Kan. Nov.16, 1992). In that case, the Section 1029 counts were dismissed because the indictment failed to allege that the access devices were unauthorized. *See id.* at *3–*5. We are aware of two cases in this circuit involving the "bust-out" of a travel agency, but both were brought under the wire or mail fraud statutes. *See United States v. Germosen*, 139 F.3d 120 (2d Cir.1998); *United States v. Arce*, No. CR 93–589, 1995 WL 116370 (E.D.N.Y. Feb.28, 1995).

**4.** The government conceded at oral argument, and our caselaw holds, that some account must actually be accessed in the commission of a fraud chargeable under Section 1029. *See, e.g., United States v. Blackmon*, 839 F.2d 900, 913–14 (2d Cir.1988) (holding Section 1029 inapplicable to use of credit cards as means of effecting "false identification in connection with frauds upon victims who were neither the owners . nor the issuers of the cards," where account was never accessed).

the expectation of payment, at some later point in time, as described by the entry of credits and debits in a formal record." *United States v. Bailey*, 41 F.3d 413, 417 (9th Cir.1994).

When the volume of an agency's cash sales causes a deficiency in the account that exceeds the collateral, the airline has in effect extended credit reflected in a "debit memo" requesting payment from the agency. This relationship is tantamount to a partially collateralized line of credit, and it was precisely this credit line that created the incentive and opportunity for the "bust-out." The expected profit from the "bust-out" came from the creation of validated tickets with value far in excess of the collateral and from their sale at a discount for cash to be pocketed by Agha.

We find nothing in either the legislative history or existing caselaw that undercuts our decision. Congress intended the statute to cover circumstances involving the use of technology in fraudulent credit transactions that might not be reached by other legislation. It therefore included a broad definition of "access device." In that regard, the House Report commented that Section 1029 would:

> cover credit cards, debit cards, account numbers and combinations of these and other methods of obtaining money, goods and services. The definition of [access device] is broad enough to encompass future technological changes and the only limitation [viz., the parenthetical exclusion, in Section 1029(e)(1), of transfers originated solely by paper instrument] excludes activities such as passing forged checks. This definition, however, includes the invoices, vouchers, sales drafts and other manifestations of access devices used between merchants and credit card companies for payment for access device transactions.

H.R.Rep. No. 98–894, at 19, *reprinted in* 1984 U.S.C.C.A.N. 3689, 3705.

Other courts have given a broad interpretation to Subsection 1029(e)(1). For example, the Fifth Circuit has held long-distance telephone codes to be access devices. *See United States v. Brewer*, 835 F.2d 550, 553 (5th Cir.1987). The Eleventh Circuit has applied the statute to cellular telephone microchips that store and transmit account information, even though such microchips were capable of accessing an account only after having been electronically imprinted with an account number using a computer, which is not itself an access device. The court stated that Section 1029 "extends the definition of access device to any means of account access that can be used to obtain goods or services regardless of whether the means of access is alone sufficient to complete the transaction or whether it must be used in conjunction with another access device to do so." *United States v. Sepulveda*, 115 F.3d 882, 887 (11th Cir. 1997); *see also United States v. Dabbs*, 134 F.3d 1071 (11th Cir.1998) (holding that merchant account numbers used to access funds from credit sales drafts are access devices).

The Ninth Circuit has applied the statute to the use of modified cellular telephones that "fool[ed] the local network into permitting calls placed by those phones to be completed ... even though the call could never be billed"—although no actual account was accessed in making the calls. *Bailey*, 41 F.3d at 415. The Ninth Circuit held that the "account access" requirement pertains to "access to the privileges permitted by maintenance of an account," *id.* at 417, and that the crucial element was that the access devices in question could "obtain goods or services from which [the user] would otherwise be excluded." *Id.* at 418; *accord United*

*States v. Watson,* 118 F.3d 1315, 1318 (9th Cir.1997).

Appellant relies on *United States v. McNutt,* 908 F.2d 561, 563–64 (10th Cir. 1990), in which the Tenth Circuit declined to apply Section 1029 to satellite television descramblers cloned from a descrambler with a legitimate, open account. However, the account itself was not accessed by the cloned descramblers, which in essence enabled free riders to unscramble a television signal that was broadcast openly. Although there may be tension between *Bailey* and *McNutt* with regard to the significance of accessing an account, and between *Bailey* and our decision in *Blackmon* with regard to the same issue, *see, supra* note 3, we need not address this tension because, here, the airlines provided travel services under a credit account that was accessed by the validated tickets.

Appellant also argues that because paper tickets were "used to initiate a transfer of funds," the exception in Subsection 1029(e)(1) for "transfer[s] originated solely by paper instrument" applies. The above-quoted legislative history states that this exception was intended to apply to the passing of bad or forged checks, and we have declined to extend the exception to the fraudulent use of credit card account numbers through the passing of paper instruments. *See United States v. Caputo,* 808 F.2d 963, 966 (2d Cir.1987) (applying Section 1029 to use of restaurant checks with credit card account numbers imprinted on them and holding explicitly that exception for transfers initiated solely by paper instrument does not apply to that conduct). This is consistent with the quoted legislative history, which also states that the "paper instrument" exception does not apply to "manifestations of access devices used between merchants and credit card companies." H.R.Rep. No. 98–894, at 19, *reprinted in* 1984 U.S.C.C.A.N. 3689, 3705. We take that statement to mean at a minimum the following: When there is in existence a physical access device, such as a credit card or, here, the ARC metal plate, transactions involving paper instruments containing the number from that device are not within the "paper instrument" exception because the paper instruments are not the "sole[ ]" originators of the transaction.

Moreover, the "paper instrument" exception relates only to the "initiat[ion][of] a transfer of funds" and not to the uses mentioned in the preceding clause, such as the "obtain[ing of] money, goods, services, or any other thing of value." The most natural meaning of that language is, again at a minimum, to bar use of the "paper instrument" exception in cases where the victim provides only things of value or provides money in a transaction that does not constitute a "transfer of funds" from an account. For example, in the present case a cash refund for a cancellation of one of the validated tickets sold by Agha Budget Travel as part of appellant's scheme would be only an incidental and fortuitous payment of cash by the victim because the scheme was designed principally to obtain money by selling rights to the victim's valuable services. As such, the access device did not "initiate a transfer of funds." We need not probe further into possible meanings of this statutory language because it clearly does not apply here.

*b) The Definition of "Unauthorized"*

Appellant contends that even if a validated ticket is properly considered an "access device," the evidence was insufficient as a matter of law to prove that the use of the tickets here was "unauthorized," as required by Section 1029.

Subsection 1029(e)(3) defines an "unauthorized access device" in pertinent part as "any access device that is lost, stolen, ex-

pired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3). The government relies solely upon the contention that the validated tickets were "obtained with intent to defraud." In response, appellant notes that he obtained the ARC account number and the airline identification numbers in 1988, five years before the "bust-out" took place. He further argues, and the government does not deny, that there was no evidence that he intended to defraud the airlines when he obtained the account. With regard to the ticket stock, appellant points out that when he obtained his last shipment in May 1993—one month before any of the activity specified in the indictment—the ticket stock was blank and worthless. It could not, he concludes, constitute an access device.

We might well be prepared to hold that the obtaining of the blank ticket stock was done with the intent to defraud and was sufficiently close to the indictment period to allow us to affirm. *See United States v. Teague,* 93 F.3d 81, 84 (2d Cir.1996). However, the blank ticket stock is not an access device and, we are unpersuaded that its validation constituted the "obtain[ing]" of an access device, regardless of the underlying intent.

There is no dispute that, in the present matter, the pertinent access device is a fully validated ticket-one imprinted with an ARC account number, an airline identification number, and customer travel itinerary. Without the imprinted material, a ticket form accesses nothing. Nor do the account and identification numbers or itinerary "constitute access devices" that are used "in conjunction with" another access device, the ticket stock. We do not understand the government to argue otherwise.

■ Rather, the government seems to contend that the creation of validated tickets using fraudulently obtained blank ticket stock fulfilled the statutory requirement. We disagree. The language of the statute requires that the access device itself be "obtain[ed.]" We are aware that "obtain" can be broadly read to include acts of creation, such as Agha's transforming blank ticket stock into validated tickets. *See* Webster's Third New International Dictionary 1559 (Philip Babcock Gove et. al eds.; 1981). However, it cannot be so construed in the context of the present statute. "Obtained with the intent to defraud" must be read consistently with the canon of construction *ejusdem generis.* That canon dictates that general language in a list of otherwise specific items of a particular class must be limited to that class. *See, e.g., Molloy v. Metro. Transp. Auth.,* 94 F.3d 808, 812 (2d Cir.1996); *United States v. Clark,* 765 F.2d 297, 303 (2d Cir.1985). In the context of the present statute, that relevant class consists of *previously created* access devices that are either wrongfully acquired—"lost, stolen"—or are invalid at the time of use—"expired, revoked, canceled." The creation of a valid access device with the intent to defraud does not fit within that class.[5]

More importantly, Section 1029(a) contains ten subsections, and five of the ten include the verb "produces." Subsection 1029(e)(4) defines "produce" to include, *inter alia,* acts of "authenticat[ion]" or "assembl[y]," which far more accurately describe Agha's creation of validated tickets from blank stock than does "obtain." It is,

---

**5.** Judge Leval, who joins in the opinion in all other respects, would rule that an access device created by the defendant with intent to defraud is "obtained with intent to defraud"

within the meaning of § 1029(e)(3), and that Agha was therefore properly convicted of violating § 1029(a)(2), both as a principal and as an aider and abetter.

therefore, of significance that Subsection 1029(a)(2) does not prohibit the "production" of unauthorized access devices, but only trafficking in or using them to defraud. And, in defining "unauthorized," Subsection 1029(e)(3) uses only "obtained" but not "produced" before "with intent to defraud." We believe that the failure to include in either (a)(2) or (e)(3) a word that is otherwise common to the statute is a significant omission that must be honored.[6]

■ However, we see no prejudicial error. Appellant sold the validated tickets at a deep discount to persons who knowingly defrauded the various airlines of $1 million in services. Because the purchasers clearly "obtained" the tickets with the requisite fraudulent intent, their use of the tickets was "unauthorized" and clearly violated the statute. With regard to the conspiracy count, it is beyond question that appellant agreed with the purchasers of the validated tickets to engage in a scheme that violated the statute.[7]

■ With regard to the substantive charge, appellant's acts did not constitute a violation of every element of the crime. Nevertheless, he aided and abetted the crime committed by his purchasers, acts that under federal law render him punishable as a principal. 18 U.S.C. § 2(a). To be sure, the district court mistakenly declined to charge the jury on an aiding and abetting theory, see Note 1, supra, although the indictment charged it. But the failure to do so was harmless to appellant.

■ Even a failure to charge the jury on an element of a crime can be harmless, see Neder v. United States, 527 U.S. 1, 13, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), where the evidence on the issue could not lead to a rational jury finding for the defendant, see United States v. Jackson, 196 F.3d 383, 384 (2d Cir.1999). The present case requires no complex analysis. A conviction for aiding and abetting a Subsection 1029(a)(2) violation required only a showing that Agha associated himself with the crime and sought by some act to help the crime succeed. See United States v. Samaria, 239 F.3d 228, 235–36 (2d Cir. 2001). Here, the jury convicted appellant of the crime itself. It could hardly have reached that conclusion and have left any possibility that it would have acquitted appellant of aiding and abetting the crime. There is no element of aiding and abetting the crime that was not found by the jury, and no defense that was not rejected by it.

6. We do not, however, hold that Agha might not have been validly charged under other subsections of Section 1029(a). Subsection 1029(a)(4) applies to one who "has control or custody of, or possesses device-making equipment" with fraudulent intent. When Agha undertook the "bust-out," he possessed the metal plate, ARC number, and blank ticket stock, which arguably fell within the definition of device-making equipment, i.e., "equipment, mechanism[s], or impression[s] designed or primarily used for making [validated tickets]," 18 U.S.C. § 1029(e)(6). Also, Subsection 1029(a)(6) applies to one who, with fraudulent intent and "without the authorization of the issuer ... solicits a person for the purpose of ... offering an access device ...." One aspect of the "bust-out" had to have included negotiations by Agha with the buyers of the validated tickets, acts that arguably fell within Subsection 1029(a)(6). Obviously, these issues are not posed in the present matter, and we do not resolve them.

7. Moreover, the conspiracy conviction would seemingly stand in any event. The indictment alleged that the conspiracy had two objects: trafficking in unauthorized access devices and wire fraud. Because the claim of error under discussion relates only to the first object, it is not by itself sufficient to overturn the conviction. See United States v. Garcia, 992 F.2d 409, 416 (2d Cir.1993) (holding that if challenge is evidentiary, as long as there was sufficient evidence to support one of the theories presented, then verdict should be affirmed.).

Aiding and abetting instructions do not provide a defense. Rather, they provide an additional theory of guilt. The error was therefore entirely harmless.

### c) Challenges to the Jury Charge

Appellant challenges the jury charge on three separate grounds. Because he raised none of these claims below, we review only for plain error. *See United States v. Ballistrea*, 101 F.3d 827, 834 (2d Cir.1996).

Appellant first argues that the district court, by stating in the jury charge that "there is no dispute that the tickets in question here are access devices under the law," took an issue of fact away from the jury. This charge, however, merely reflected the district court's correct interpretation of Section 1029 as extending to the facts of this case. Further, because there was no dispute at trial over whether the tickets constituted access devices and our opinion reaches the same conclusion, the district court was not required to give the issue to the jury. Moreover, we agree with the authors of Modern Federal Jury Instructions, who suggest that in charging a jury in a Section 1029 case, "[w]here there is no dispute that the device at issue is an access device, the first element [that the instrument in question is an access device] need not be read to the jury. In such cases, the jury should be expressly charged that the device in question is an access device." Sand et al., Modern Federal Jury Instructions § 40–3 cmt. (1998).

■ Second, appellant contends that the district court failed to inform the jury of the *mens rea* element of Section 1029. Reviewing the jury charge as a whole, however, as we must, *see United States v. Jones*, 30 F.3d 276, 284 (2d Cir.1994) ("[W]e look at the charge as a whole to see if it correctly stated the law."), we find no error, plain or otherwise. The district court clearly stated in its charge that "[t]he third element the government must establish beyond a reasonable doubt is that the defendant acted knowingly and with an intent to defraud."

Finally, appellant argues that the district court failed to instruct the jury on the intent element of the wire fraud alleged in the conspiracy count. We disagree. The charge provided: "It is also charged that as a part of the conspiracy, that the defendants and others, having devised and intending to devise, a scheme to defraud, allegedly reserved and purchased airline tickets by means of wire communications . . . in violation of Section 1343."

### CONCLUSION

We therefore affirm.