OPINION AND ORDER SUSTAINING DEFENDANT’S OBJECTION TO PRESENTENCE REPORT
 

 LAWSON, District Judge.
 

 This matter is before the Court on an objection filed by the defendant to a portion of a presentence report prepared following the defendant’s guilty-plea-based conviction of conspiracy to commit bank fraud contrary to 18 U.S.C. § 371. The defendant objects to a proposed two-level increase of her offense level for the production of trafficking in an unauthorized or counterfeit access device. The Court concludes that the facts presented do not warrant such an increase, and therefore the objection will be sustained.
 

 I.
 

 The defendant, Julie Humes, was named with two others in an eight-count superseding indictment that alleged that she engaged in a fraudulent scheme to defraud certain federally insured financial institutions. The scheme involved the presentation of phony checks to banks for deposit into legitimate bank accounts, after which funds would be withdrawn from the bank accounts by either writing checks against the funds represented by the bogus deposits, wire transferring those “funds,” or simply making withdrawals from the legitimate bank accounts.
 

 The bogus checks were printed in such a manner as to appear genuine, but, according to the government, they were “issued by non-existent companies, such as a counterfeit title company.” Gov’t’s Resp. to Def.’s Obj. at 2-3. In other words, the checks displayed a series of numbers in
 
 *CMXXXVI
 
 tended to represent an account number, but the number string was meaningless and actually accessed no existing or closed account in the name of a real account holder at any financial or business institution. The Court infers from this representation, therefore, that the checks were never cleared through the banking system, but rather the deposits represented by these bogus checks remained as uncollected funds against which the account holders made their withdrawals.
 

 Count 1 of the first superseding indictment charges conspiracy against Humes, Sandra McIntosh and Robin Young in violation of 18 U.S.C. § 371. Counts 2 through 8 charge the various defendants with engaging in a scheme to defraud contrary to 18 U.S.C. § 1344 (and aiding and abetting) by means of the individual phony checks that were deposited or that they attempted to negotiate. Humes was charged in counts 6, 7 and 8 in connection with three bogus checks that she transacted between January 7 and 14, 2003 totaling approximately $64,399. The presen-tence report states that the total amount involved in the scheme is over $383,000.
 

 It appears from the facts reported by the presentence investigator that Young had access to the bogus checks, and he recruited McIntosh into the conspiracy, who in turn recruited Humes. Humes was furnished with a bogus check in the amount of $29,622.91 bearing the name of “All Star Real Estate Team” as maker, which she deposited into her own account at Chemical Bank on January 10, 2003. Humes had obtained $17,519 from Chemical Bank three days earlier by cashing a bogus check purportedly made by Colonial Title Company. Humes’s account at Chemical Bank was frozen before she could withdraw all the funds, limiting the bank’s loss to a little more than $27,000. However, on January 14, 2003, Humes’ sister, Carolyn Harvey, was arrested while attempting to deposit a bogus check in the amount of $17,258.19 into her account at a credit union, which led to uncovering the scheme in this case.
 

 On September 15, 2003, Humes pleaded guilty to count 1 of the indictment (the conspiracy count) in exchange for a dismissal of the remaining counts against her. The plea agreement called for a sentence not to exceed the maximum of the applicable sentencing guidelines range to be determined by the Court. The plea agreement also included a stipulation as to the fraud loss amount to be used in calculating the sentencing guidelines range. The pre-sentence report revealed a fraud loss amount attributable to Humes’ relevant conduct exceeding the amount in the stipulation, and at the sentencing hearing held on January 8, 2004, Humes was given an opportunity to withdraw her guilty plea, which she declined and chose to persist in her plea.
 

 The Court determined that Humes’ base offense level was six according to Section 2Bl.l(a) of the 2002 version of the United States Sentencing Commission Sentencing Guidelines Manual. The base offense level was increased by eight levels because of the fraud loss amount,
 
 see
 
 U.S.S.G. § 2Bl.l(b)(l)(E), and then reduced by three levels for the defendant’s timely acceptance of responsibility.
 
 See
 
 U.S.S.G. § 3El.l(a) & (b). The presentence report called for an additional two-level increase under U.S.S.G. § 2Bl.l(b)(9)(B) on the theory that the offense involved the trafficking of an unauthorized or counterfeit access device. The defendant has objected to this increase.
 

 The Court ordered the parties to submit briefs on the applicability of the contested guidelines provision, and oral arguments were heard on March 10, 2004. The Court took the matter under advisement in order to issue a written opinion, since the ques
 
 *CMXXXVII
 
 tion presented has not been decided in this circuit. The Court also granted the parties’ request to submit supplemental briefs.
 

 II.
 

 United States Sentencing Guidelines Manual Section 2Bl.l(b)(9) states:
 

 If the offense involved (A) the possession or use of any device-making equipment; (B) the production or trafficking of any unauthorized access device or counterfeit access device; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification; or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.
 

 Guidance in the application of this section is furnished by the commentary in the Sentencing Guidelines Manual, which provides:
 

 Definitions. — For purposes of subsection (b)(9):
 

 “Counterfeit access device” (i) has the meaning given that term in 18 U.S.C. 1029(e)(2); and (ii) includes a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications service .... “Unauthorized access device” has the meaning given that term in 18 U.S.C. 1029(e)(3).
 

 U.S.S.G. § 2B1.1(b)(9), comment, (n. 8). Thus, the application of this guidelines section turns on whether the defendant’s fraudulent scheme involved the use of an “access device,” either unauthorized or counterfeit, as that term is defined by 18 U.S.C. § 1029(e).
 

 Congress enacted Section 1029 in 1984 for the express purpose of “stem[ming] the tide of criminal behavior” resulting from the “growing problem in counterfeit credit cards and unauthorized use of account numbers or access codes to banking system accounts called debit instruments.” H.R. Rep. 98-894,
 
 reprinted in
 
 1984 U.S.C.C.A.N. 3689, 3689-90. It was reported that valid credit account numbers could be misused in several ways to commit fraud, including obtaining valid account numbers disclosed in legitimate sales from dishonest merchants or their employees and in a variety of other ways, and then making unauthorized sales by transcribing those account numbers on blank sales slips, or using them in telephone orders, or embossing them on counterfeit credit cards. H.R. Rep. 98-894,
 
 reprinted in
 
 1984 U.S.C.C.A.N. 3689, 3693. Section 1029 was enacted to criminalize such conduct, and' it prohibits the use, trafficking in, production and possession of unauthorized and counterfeit access devices with intent to defraud, and the sale and solicitation of information regarding access devices.
 
 See
 
 18 U.S.C. § 1029(a).
 

 An “access device” is defined as
 

 any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).
 

 18 U.S.C. § 1029(e)(1). A “counterfeit access device” is “any access device that is counterfeit, fictitious, altered, or forged, oí-an identifiable component of an access device or a counterfeit access device.” 18 U.S.C. § 1029(e)(2). An “unauthorized access device” is “any access device that is
 
 *CMXXXVIII
 
 lost, stolen, expired, revoked, canceled, or obtained with intent to defraud.” 18 U.S.C. § 1029(e)(3).
 

 The defendant argues that the bogus checks used in this case to commit the fraud do not fit the definition of either a counterfeit or an unauthorized access device because phony checks have been carved out of the definition of “access devices” in Section 1029(e)(1) as “a transfer originated solely by paper instrument.” The Court of Appeals for the Fifth Circuit encountered a similar argument when it invalidated a conviction under Section 1029 under similar circumstances.
 
 See United States v. Hughey,
 
 147 F.3d 423 (5th Cir.1998). In that case, Hughey deposited into his own checking account counterfeit checks purportedly issued by Houston Power & Light that contained the correct account and routing number for that business. He also cashed those checks at a local merchant. Hughey was charged with violating 18 U.S.C. § 1029(a)(2) on the theory that he used an unauthorized access device — that is, Houston Power
 
 &
 
 Light’s account number — with intent to defraud. However, the court of appeals held that no federal crime was committed because the account number, which itself is an “access device,” was contained on the phony checks that were either deposited or cashed, and therefore the transactions were initiated by a paper instrument. The court explained that “the plain text of the statute makes § 1029 inapplicable to conduct involving ‘(transfers] originated solely by paper instrument).’ 18 U.S.C. § 1029(e)(1). That parenthetical exclusion unambiguously places the passing of bad checks and similar conduct outside the scope of the federal statute.”
 
 Hughey,
 
 147 F.3d at 434. The court cited the legislative history contained in congressional reports in support of its interpretation of the statute.
 
 See
 
 S.Rep. No. 98-368 at 10 (“By specifically excluding transfers of funds originated solely by paper instrument, it covers offenses such as those included in the Electronic Fund Transfer Act, but does not cover activities such as passing bad checks.” (footnote omitted)); H.R.Rep. No. 98-894, at 19 (“This would cover credit cards, debit cards, account numbers, and combinations of these and other methods of obtaining money,' goods and services. The definition of this term is broad enough to encompass future technological changes and the only limitation i.e., ‘(other than a transfer originated solely by paper instrument)’ excludes activities such as passing forged checks.”).
 

 The Court of Appeals for the Second Circuit referenced the same legislative history in
 
 United States v. Caputo,
 
 808 F.2d 963 (2d Cir.1987), where the court rejected the defendant’s argument that Section 1029 did not apply to a fraud committed by means of obtaining credit card account numbers from carbon imprints on paper restaurant checks. The court held that the exception in Section 1029(e)(1) applied only to “passing bad or forged checks,” and did not extend to other transactions where the access device (i.e. the account number) happened to be found on a paper.
 
 Id.
 
 at 966.
 

 In
 
 United States v. Abozid,
 
 257 F.3d 191 (2d Cir.2001), the court found within the scope of Section 1029 a scheme in which the defendants used their travel agency business to print paper airline tickets, which contained the travel agent’s account number and the airline’s identification code, and then sold the tickets at deep discounts and pocketed the money. The tickets were printed on paper, and when they were validated with the account codes mentioned above, they could be used to obtain services from the airlines. The court rejected the argument that the “paper instrument” exception applied, stating
 

 When there is in existence a physical access device, such as a credit card or,
 
 *CMXXXIX
 
 here, the ARC metal plate, transactions involving paper instruments containing the number from that device are not within the “paper instrument” exception because the paper instruments are not the “sole[ ]” originators of the transaction. Moreover, the “paper instrument” exception relates only to the “initi-at[ion][of] a transfer of funds” and not to the uses mentioned in the preceding clause, such as the “obtain[ing of] money, goods, services, or any other thing of value.” The most natural meaning of that language is, again at a minimum, to bar use of the “paper instrument” exception in cases where the victim provides only things of value or provides money in a transaction that does not constitute a “transfer of funds” from an account.
 

 Id.
 
 at 197.
 

 The government argues that the checks in this case were not “bad” or “forged” as described in the legislative history recounted in
 
 Abozid
 
 because they did not contain an actual account number. That observation is material, as will be explained more fully below, but it does not affect the application of the “paper instrument” exception. The government urges this Court to distinguish
 
 Hughey
 
 because the defendant in that case cashed or deposited the bogus checks and received his money on the spot, whereas Humes deposited the bogus checks in this case and then accessed her account to withdraw the ill-gotten funds over the period of a few days.
 

 The Court cannot accept that distinction. It is clear that when Humes withdrew funds from her account at Independence Bank, she used an access device consisting of her own account number. However, the use of that account number was not unauthorized; rather it was her own account number that she could legally use to make transactions in her own account. Nor was the access device counterfeit. The bogus checks — paper instruments — were used to initiate the transfer of funds when the checks were deposited into Humes’ account. The Court detects no meaningful distinction between the circumstances described in
 
 Hughey
 
 and those presented in this case.
 

 There is another reason, however, that the bogus checks utilized in the fraudulent scheme do not qualify as “access devices.” The gravamen of the definition contained in 18 U.S.C. § 1029(e)(1) is a device that permits accessing an actual account. The court in
 
 United States v. Bailey,
 
 41 F.3d 413, 417 (9th Cir.1994), defined an account as “a contractual relationship that makes possible the provision of goods, services, or money based on payment, or the expectation of payment, at some later point in time, as described by the entry of credits and debits in a formal record.” Cases that have applied Section 1029 to punish fraudulent schemes have focused on the structural relationship between the coded information in the access device and an actual account that provides goods, services or cash.
 
 See, e.g., United States v. Brewer, 835
 
 F.2d
 
 550, 553 (5th
 
 Cir.1987) (holding that long-distance telephone codes allowing calls to be credited to a customer’s account are access devices);
 
 United States v. Sepulveda,
 
 115 F.3d 882, 887 (11th Cir.1997), (applying Section 1029 to cellular telephone microchips that store and transmit account information where such microchips were capable of accessing an account after having been electronically imprinted with an account number using a computer, and observing that the statute “extends the definition of access device to any means of account access that can be used to obtain goods or services regardless of whether the means of access is alone sufficient to complete the transaction or whether it must be used in conjunction with another access device to do so”);
 
 United States v. Dabbs,
 
 134 F.3d 1071 (11th Cir.1998) (holding that merchant account num
 
 *CMXL
 
 bers used to access funds from credit sales drafts are access devices).
 
 Compare United States v. McNutt,
 
 908 F.2d 561, 563-64 (10th Cir.1990) (declining to apply Section 1029 to satellite television descramblers cloned from a descrambler with a legitimate, open account where the account itself was not accessed by the cloned de-scramblers). The
 
 Bailey
 
 court held that the “account access” requirement pertains to “access to the privileges permitted by maintenance of an account,” 41 F.3d at 417, and that the crucial element was that the access devices in question could “obtain goods or services from which [the user] would otherwise be excluded.”
 
 Id.
 
 at 418.
 

 The number string imprinted on the checks Humes deposited did not represent an actual account number. It accessed nothing. Consequently, neither the account number nor the check on which it was printed constituted an access device within the meaning of Section 1029(e)(1). Therefore, it could not qualify as either an “unauthorized access device” or a “counterfeit access device” under the statute or the Sentencing Guidelines. The checks surely were fraudulent and they were part of a scheme to defraud prohibited by 18 U.S.C. § 1344. However, a bogus check that contains a representation of an “account number” that does not access an existing account or one that is expired, revoked or cancelled cannot fit within the definition of “access device.”
 

 The Court finds that Humes’ crime did not involve trafficking in any unauthorized or counterfeit access device within the meaning of U.S.S.G. § 2Bl.l(b)(9)(B). Her offense level, therefore, will not be increased by two levels on the authority of that section.
 

 III.
 

 The Court finds that a fraudulent check that contains a number string that does not represent as actual or former account cannot constitute an “access device” as defined by 18 U.S.C. § 1029(e). The use of those checks in perpetrating the fraudulent scheme, therefore, do not trigger the application of U.S.S.G. § 2Bl.l(b)(9)(B). The defendant’s objection to the increase in her offense level by two levels on the authority of this section is well taken.
 

 Accordingly, it is ORDERED that the defendant’s objection to Paragraph 32 of the presentence report is SUSTAINED.
 

 It is further ORDERED that the parties appear before this Court on April 28, 2004 at 3:00 p.m. for the completion of the sentencing hearing.